Debi **EYERMAN**, Plaintiff–Appellant,

v.

**MARY KAY COSMETICS, INC.,**
Defendant–Appellee.

Nos. 91–3083, 91–3690.

United States Court of Appeals,
Sixth Circuit.

Argued May 5, 1992.

Decided June 12, 1992.

John C. McDonald, Columbus, Ohio, Ann Lugbill, James B. Helmer, Jr. (argued and briefed), Lynn D. Pundzak, Helmer, Lugbill & Whitman, Cincinnati, Ohio, for plaintiff-appellant.

Mary Ellen Fairfield (argued and briefed), Vorys, Sater, Seymour & Pease, Columbus, Ohio, John F. McCarthy, Jr., Johnson, Bromberg & Leeds, Dallas, Tex., for defendant-appellee.

Before: GUY, BOGGS, and SILER, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

The plaintiff, a former high-ranking participant in the defendant's cosmetics marketing program, appeals from the district court's grant of summary judgment against her handicap discrimination and breach of contract claims. We affirm.

## I.

The defendant, Mary Kay Cosmetics, Inc. (MKC), sells its products through a 170,000–strong force of salespersons organized into a pyramidal structure. The salespersons earn commissions and prizes on their sales and the sales of those they recruit into their personal pyramids. Entry-level salespersons, known as beauty consultants, become sales directors when they recruit 30 persons into their pyramids. At the top of such sales pyramids is found one of the approximately 60 national sales directors.

The plaintiff, Debi Eyerman, began selling MKC products in the late 1970s. By 1983, Eyerman had become a national sales director. At a "wedding" ceremony marking the occasion, MKC's chairperson, Mary Kay Ash, administered an oath to Eyerman and unveiled a portrait of Eyerman to hang at MKC's headquarters in Dallas.

When Eyerman became a national sales director, Eyerman and MKC executed a National Sales Director Agreement (NSDA). The NSDA provided, among other things, that Eyerman would receive commissions and prizes based on the performance of her sales group, would maintain an office, would provide advice to lower-ranking salespersons, and would attend meetings as necessary.

The agreement further provided that Eyerman would be considered an independent contractor, and not an employee, for tax and other purposes. The NSDA also stated that Eyerman would not be an agent of MKC. Specifically, Eyerman would not have the right to conduct business for, act on behalf of, or bind MKC, and MKC would not have the right to control how Eyerman conducted her activities.

The NSDA had a one-year term, but was automatically renewed each year if not terminated. Each party retained the absolute right to terminate the agreement with 60 days' notice, and MKC retained the right to terminate the agreement for cause with 30 days' notice. The grounds for termination for cause included the conviction of a crime or the performance of any act detrimental to MKC's reputation.

Until MKC terminated her agreement in 1988, Eyerman prospered as a national sales director. She earned large commissions and bonuses from the performance of her sales group. In addition, Eyerman received valuable prizes awarded by MKC to each of its national sales directors, including a new pink Cadillac every two years.

Throughout this period, however, Eyerman was engaged in a battle against alcoholism. MKC officials were aware of Eyerman's alcoholism because they had observed her behavior at meetings and because Eyerman had exchanged letters about her problem with Mary Kay Ash.

By 1988, MKC officials learned that Eyerman had lost her driver's license after a drunk driving conviction. MKC also learned that Eyerman had run her pink Cadillac off the road after losing her li-

cense and that she had refused a breathalyzer test after the accident.

In October 1988, Bart Bartolacci, MKC's senior vice-president of sales, notified Eyerman that MKC was terminating her NSDA effective January 1, 1989. Bartolacci's letter cited the drunk driving conviction, the subsequent accident, and Eyerman's behavior at a September 1988 meeting as reasons for the termination. He stated that he was convinced that Eyerman's "alcohol problem is not sufficiently under control for us to be able to depend on your functioning as an effective National Sales Director."

Bartolacci's letter invoked MKC's right to terminate the NSDA with 60 days' notice, but noted that Eyerman's conduct would have allowed MKC to invoke its right to terminate for cause with only 30 days' notice. The letter urged Eyerman to apply for benefits under MKC's disability retirement program and closed with Bartolacci's prayers for Eyerman's recovery from her alcoholism.[1]

In December 1988, Eyerman, an Ohio resident, filed this diversity action against MKC, a Delaware corporation headquartered in Texas. Eyerman's complaint contained eight counts, all grounded in Ohio law: handicap discrimination, infliction of emotional distress, bad faith breach of contract, breach of implied contract, promissory estoppel, breach of fiduciary duty between principal and agent, breach of fiduciary duty, and unjust enrichment. After MKC moved for judgment on the pleadings, the district court dismissed the emotional distress claim and limited the implied contract claim to conduct occurring after the NSDA was signed. Eyerman does not appeal that ruling.

At the close of discovery, MKC moved for summary judgment on the seven remaining claims. The district court granted the motion in December 1990, and Eyerman appealed.

## II.

Before reaching the merits of the summary judgment appeal, we must determine whether certain items are in the record. A dispute developed between the parties as they prepared the joint appendix, with each party maintaining that certain items favorable to the other party should be excluded. We remanded the matter to the district court with instructions to determine the record on appeal.

 After a hearing, the district court decided that certain items proffered by Eyerman were in the record but excluded her trial exhibits. The court also ruled that a videotape MKC had marked as an exhibit to Eyerman's deposition was in the record despite MKC's failure to file the videotape.

Eyerman then filed an appeal of the district court's ruling. We consolidated this appeal with her earlier appeal on the merits. The appendix to the second appeal contains the disputed trial exhibits and the transcript to the videotape.

The district court allowed MKC to add the transcript of the videotape pursuant to Fed.R.App.P. 10(e). That rule provides that the district court will decide whether a disputed item is in the record on appeal. In particular, Rule 10(e) provides that, if items have been "omitted ... by error or accident ..., the district court ... may direct that the omission ... be corrected...." The parties agree that the rule commits this determination to the discretion of the district court.

We find that the district court did not abuse its discretion in adding the videotape to the record on appeal. MKC had marked the videotape as an exhibit to Eyerman's deposition. That deposition was itself in the record, along with nearly all of the other marked exhibits to the deposition. Eyerman points to no evidence that would contradict MKC's claim that the failure to file the tape was inadvertent. Furthermore, since MKC quoted from the tape in its brief before the district court, and since

---

**1.** Eyerman did not receive disability retirement benefits from MKC because she refused to sign a form stating that an application for benefits constituted an election for voluntary termination of the NSDA.

the court apparently relied on those quotes in its summary judgment determination, the videotape was part of the proceedings below. Accordingly, we affirm the decision to include the videotape in the record.[2]

▮ Eyerman next argues that the district court erred by excluding her trial exhibits from the record. Although they were never formally filed, Eyerman gave the exhibits to court personnel three days before the summary judgment hearing, and counsel alluded to those exhibits during the hearing.

We now have the disputed exhibits before us in the joint appendix to the second appeal. We find from our examination of those exhibits that they do not change the outcome of the appeal on the merits. Therefore, we shall consider the exhibits in our review of the merits, and we need not decide whether the district court properly excluded them from the record.[3]

### III.

▮ Having decided to consider all of the evidence before us, we now turn to the merits of Eyerman's appeal. Summary judgment is appropriate if the non-moving party fails to establish a genuine issue of material fact on an element essential to her case and on which she would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In making that determination, we view the evidence in the record in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). We review the district court's grant of summary judgment *de novo*. *EEOC v. Univer-*

*sity of Detroit*, 904 F.2d 331, 334 (6th Cir. 1990).[4]

### A.

Count I of Eyerman's complaint alleges that MKC terminated her on account of her handicap, in violation of Ohio Rev.Code § 4112.02. That section provides, in part:

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the race, color, religion, sex, national origin, handicap, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of *employment*, or any matter directly or indirectly related to *employment*.

Ohio Rev.Code § 4112.02(A) (emphasis added). Alcoholism is one of the handicaps protected by this provision. *See Hazlett v. Martin Chevrolet, Inc.*, 25 Ohio St.3d 279, 496 N.E.2d 478, 479–80 (1986).

Section 4112.01 defines an "employee" to be "an individual employed by any employer" and an "employer" to be "any person employing four or more persons within the state." Ohio Rev.Code § 4112.01(A)(2) and (3). Section 4112.01 does not define the terms "employment" or "employ."

MKC argues, and the district court found, that section 4112.02 did not apply to Eyerman because she was an independent contractor, not an employee. Eyerman maintains that she was an employee and that, even if she was not an employee, section 4112.02 prohibits employers from discriminating against independent contractors as well as employees.

---

**2.** We find unpersuasive Eyerman's attempt to draw a distinction between the videotape and the certified transcript of the tape.

**3.** Eyerman appears to argue that the district court's exclusion of allegedly proper evidence from the record automatically mandates a reversal of the decision on the merits. Since we review summary judgment decisions *de novo* based on the record before us, any error in the record in the district court is immaterial to the outcome of this appeal.

**4.** MKC agrees that we must review a grant of summary judgment *de novo*, but argues that we should defer to the district court's interpretation of Ohio law. We formerly gave some deference to the state law interpretations of district courts sitting in diversity, *see White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 944 (6th Cir.1990), but the Supreme Court has recently held that such deference is inappropriate. *Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 1222–23, 113 L.Ed.2d 190 (1991).

We turn first to the question of whether Eyerman was an employee. Our analysis begins with the NSDA, which unambiguously declared Eyerman to be an independent contractor. Consistent with this agreement, MKC did not pay Eyerman a salary, did not treat her as an employee for tax purposes, did not set her working hours, and did not provide her with vacations or sick pay. We also note that Eyerman regarded herself as self-employed for tax purposes.

■ Eyerman maintains, however, that she was a *de facto* employee. Ohio courts distinguish between employees and independent contractors by determining whether the employer has the right to control the manner in which the work is performed. *See Marshall v. Aaron,* 15 Ohio St.3d 48, 472 N.E.2d 335, 337 (1984).

■ Eyerman produced a chart for the district court listing 53 "indicia of control" to show that MKC controlled her work. For example, Eyerman alleges that MKC provided her with pink Cadillacs, travel reimbursements, and business cards; that MKC recommended or required that she attend certain meetings and wear certain clothes to those meetings; and that MKC asked her to give speeches and motivate others.

MKC argues that these indicia do not amount to significant control. MKC also points out that Eyerman prepared a videotape, entitled "How to Build a Successful Business," in which Eyerman repeatedly stated that she is self-employed, owns her own business, sets her own hours, writes her own paychecks, and is disciplined only by herself.

The district court, after discussing Eyerman's indicia of control at considerable length, concluded that none of them involved significant control over the way Eyerman conducted her business. We agree and conclude that Eyerman has failed to raise a genuine issue of material fact as to whether she was an employee of MKC.

■ Eyerman next argues that section 4112.02 protects independent contractors as well as employees. She notes that section 4112.02(A) does not contain the term "employee" but does contain the term "employer." Since "employer" is defined to be someone who employs four or more "persons" in Ohio, she maintains that this provision applies to MKC because it employs four or more independent contractors in Ohio. *See Albain v. Flower Hosp.,* 50 Ohio St.3d 251, 553 N.E.2d 1038, 1043, 1044, 1048 (1990) (repeatedly referring to relationship between "employer" and "independent contractor").

However, by its terms, section 4112.02 applies only to "employment" discrimination. Assuming that MKC is an "employer" of independent contractors in Ohio, the question becomes whether the relationship between an employer and an independent contractor is an "employment" relationship.

At least one Ohio court has concluded that section 4112.02 does not cover the independent contractual relationship. *Berger Hosp. v. Ohio Civil Rights Comm'n,* No. 86–CA–7, 1987 WL 13493 (Ohio Ct.App. June 26, 1987). Although *Berger Hospital* is unpublished and, therefore, of little or no precedential value, there is apparently no Ohio authority to the contrary.

We have considered at least twice the question of whether employment includes the independent contractual relationship in actions involving statutes similar to section 4112.02. In *Falls v. Sporting News Publishing Co.,* 834 F.2d 611 (6th Cir.1987), we examined Michigan's Elliott–Larsen Civil Rights Act, Mich.Comp. Laws Ann. § 37.-2202, a provision virtually identical to section 4112.02. We concluded that Michigan courts would not construe that provision to cover independent contractors. *Falls,* 834 F.2d at 613.

In *Armbruster v. Quinn,* 711 F.2d 1332 (6th Cir.1983), we examined Title VII, 42 U.S.C. § 2000e–2, another provision almost identical to section 4112.02. We decided that independent contractors would be covered by Title VII if, under an "economic realities" test, they are susceptible to the types of discrimination Title VII meant to prohibit. *Armbruster,* 711 F.2d at 1341–42. Although we did not explain in *Armbruster* what sorts of economic realities

would tip the scales toward coverage, other circuits using similar tests have held that the employer's ability to control the job performance and employment opportunities of the plaintiff is the most important factor. *See, e.g., Broussard v. L.H. Bossier, Inc.,* 789 F.2d 1158, 1160–61 (5th Cir. 1986) (affirming dismissal against independent contractor truck driver); *Doe v. St. Joseph's Hosp.,* 788 F.2d 411, 425 (7th Cir. 1986) (reversing dismissal against independent contractor physician denied staff privileges at hospital).[5]

It is true, as Eyerman points out, that the Ohio Legislature intended for section 4112.02 to be construed liberally. *See* Ohio Rev.Code § 4112.08. However, in *Armbruster,* we noted that Congress intended for Title VII to be construed broadly but declined to hold that Title VII covered independent contractors unless "economic realities" required that result. 711 F.2d at 1340–41.

As we stated above, there is no indication in the record that MKC controlled Eyerman's work in any significant way. *Cf. Kurtz v. Harcourt Brace Jovanovich, Inc.,* 69 Ohio App.3d 267, 590 N.E.2d 772 (1990) (reversing summary judgment where evidence created genuine issue as to whether representative was independent contractor or employee). Therefore, even if an Ohio court rejected the result in *Berger Hospital* and concluded that section 4112.02 could cover independent contractors under some circumstances, we do not believe that this case would present those circumstances.[6] We accordingly affirm the grant of summary judgment against Count I.

### B.

Count III of the complaint alleges that MKC's conduct amounted to a bad faith breach of an agency contract. In Count VI, Eyerman complains that MKC breached the fiduciary duties owed by a principal to its agent. MKC argues, and the district court found, that summary judgment is appropriate against both counts because Eyerman was not MKC's agent.

■ An agency relationship contains three essential attributes. First, the agent must have the power to alter the legal relations between the principal and third parties. Restatement (Second) of Agency § 12; *Funk v. Hancock,* 26 Ohio App.3d 107, 498 N.E.2d 490, 493–94 (1985). Second, the agent must be a fiduciary of the principal in matters within the scope of the agency. Restatement (Second) of Agency § 13. Third, the principal must have the right to control the agent's conduct of matters entrusted to her. Restatement (Second) of Agency § 14; *Hanson v. Kynast,* 24 Ohio St.3d 171, 494 N.E.2d 1091, 1094 (1986). As Eyerman points out, a person may be both an independent contractor and an agent. Restatement (Second) of Agency § 14N.

Before considering these attributes of agency, we observe that the NSDA unambiguously declared that Eyerman would not be MKC's agent. Eyerman correctly points out, however, that we must look beyond the agreement to the reality of the relationship between the parties.

■ Turning to the first essential element, we find that Eyerman did not have the legal power to bind MKC. The NSDA stated:

> Nothing in this Agreement shall be deemed to permit or empower [Eyerman]

**5.** *See also Nationwide Mut. Ins. Co. v. Darden,* — U.S. ——, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992) (holding that, where statute leaves "employee" undefined, courts must apply common-law test of employer's control); *Lilley v. BTM Corp.,* 958 F.2d 746 (6th Cir.1992) (applying economic realties test to claim under ADEA).

**6.** In *LeMasters v. The Christ Hospital,* 777 F.Supp. 1378 (S.D.Ohio 1991), a district court rejected *Berger Hospital* and concluded that sec-tion 4112.02(I) did not require an employer-employee relationship. *LeMasters,* 777 F.Supp. at 1381–82. Section 4112.02(I), which bars discrimination against any "person" who opposes unlawful practices under section 4112, appears to be broader than section 4112.02(A). In addition, the plaintiff in *LeMasters* was a physician whose staff privileges were suspended by a hospital. Thus, that plaintiff apparently met the control requirement. *Cf. St. Joseph's Hosp.,* 788 F.2d at 425.

to conduct business in the name of, or on account of, [MKC], or to incur or assume any expense, debt, obligation, liability, tax or responsibility in behalf of, or in the name of [MKC] or to act in [MKC's] behalf or to bind [MKC] in an way whatsoever.

Comment a to section 12 of the Restatement explains that a person possesses the requisite legal power if he or she could: (1) bind the principal in contract with a third person; (2) divest the principal of interest in a thing, such as selling the principal's goods to a third person; (3) acquire new interests for the principal; or (4) subject the principal to tort liability by injuring a third person.

Eyerman has not established a genuine issue of material fact as to her ability to alter MKC's legal relations. Although Eyerman required entry-level beauty consultants to sign MKC's contracts, those contracts were subject to approval by MKC. Thus, Eyerman could not bind MKC to a contract with a third party. Similarly, Eyerman could not bind MKC to sell its products to third parties; instead, she was limited to buying MKC products for resale to customers. There is no contention that Eyerman could purchase interests on behalf of MKC or that she could subject MKC to tort liability by injuring a third party.

Since we find that Eyerman has not established a genuine issue as to the existence of one of the essential attributes of agency, we need not consider whether her evidence satisfies the remaining two attributes.[7] We affirm the district court's grant of summary judgment against Counts III and VI.

### C.

■ Count VII of Eyerman's complaint alleges that MKC's conduct breached its *de facto* fiduciary duty to her. Such a duty may arise from a confidential relationship in which one person relies on and trusts another and in which the relationship is not necessarily legal, but may be moral, social, domestic, or personal. *Indermill v. United Savings*, 5 Ohio App.3d 243, 451 N.E.2d 538, 541 (1982).

The Ohio Supreme Court has explained that a fiduciary duty may arise from an informal relationship only if both parties understand that a special trust or confidence has been reposed. *Umbaugh Pole Bldg. Co. v. Scott*, 58 Ohio St.2d 282, 390 N.E.2d 320, 323 (1979). In *Umbaugh*, the court looked to the nature of the relationship between a creditor and debtor to determine whether the debtor had a reasonable expectation that the creditor would act solely or primarily on his behalf. *Id.* The court reversed a judgment in favor of the debtor, finding that the creditor's provision of advice and counselling in a congenial atmosphere was not enough to create a fiduciary relationship. *Id.*

Two years later, the court reached the opposite conclusion and affirmed a judgment against a bank that had advised a young couple about mortgages but had failed to inform them that they needed to purchase mortgage insurance. *Stone v. Davis*, 66 Ohio St.2d 74, 419 N.E.2d 1094, *cert. denied*, 454 U.S. 1081, 102 S.Ct. 634, 70 L.Ed.2d 614 (1981). The court upheld the trial court's determination that, under the circumstances presented, the bank acted as the couple's fiduciary when it advised them about the mortgage process. *Id.*, 419 N.E.2d at 1098.

■ MKC argues that it never understood that Eyerman had reposed any special trust or confidence in it and that Eyerman could not reasonably have expected that MKC would act solely or primarily on her behalf. Eyerman maintains that Mary Kay Ash's promises to treat the sales force according to the Golden Rule and the elaborate "wedding" ceremony promoting Eyerman to national sales director created a fiduciary relationship.

We find Eyerman's evidence insufficient to survive summary judgment. The prom-

---

**7.** Eyerman appears to argue, without citation to authority, that the ability to affect the principal's legal relations is not an essential attribute of agency. This argument is belied by the clear language of section 12 of the Restatement (Second) of Agency, and by the title of the topic, "Essential Characteristics of Relation," in which section 12 is found.

ises contained in Mary Kay Ash's book, which was sold to the public, are not evidence of a special trust or confidential relationship with Eyerman.[8] After reviewing the transcript of the "wedding" ceremony, we find nothing in it that would support an expectation that MKC would act primarily on Eyerman's behalf. At most, the book and the ceremony indicate that MKC attempts to treat its independent contractors congenially. Accordingly, we affirm the grant of summary judgment against Count VII.

### D.

Count IV alleges that MKC and Eyerman formed an implied contract to retain Eyerman as a national sales director, absent just cause, until she turned 65. In the alternative, Count V states that MKC is estopped by Eyerman's reliance from denying its promise to retain her until age 65.

Both counts depend on the existence of an enforceable promise to continue Eyerman's contract until she turned 65. The NSDA itself contained no promise that the agreement would continue beyond one year. Instead, it allowed either party to terminate the contract with 60 days' notice for any reason. The NSDA further provided that it could not be modified except in a writing signed by MKC and Eyerman. It specifically stated that the agreement "shall not be deemed to be changed, modified or altered by reason of any advice, suggestions, manuals or sales aids furnished by [MKC] to [Eyerman]."

Eyerman argues, however, that MKC's oral representations modified the NSDA. She relies on several cases in which Ohio courts have held that an employer's oral representations may modify an employment contract. *See Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150, 154–55 (1985); *Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 472 N.E.2d 765, 772–74 (1984).

MKC points out that these cases have involved employees, not independent contractors, and argues that Ohio law favors enforcement of contract clauses that require changes to be in writing. *See Rockwell Int'l Corp. v. Regional Emergency Medical Servs.*, 688 F.2d 29, 32 (6th Cir. 1982) (enforcing, under Ohio law, construction contract clause requiring modifications to be in writing).

Assuming, without deciding, that MKC's alleged oral promises could modify the NSDA despite the explicit provision barring oral modifications, we still must decide whether Eyerman established a genuine issue of fact as to the existence of such promises. There is a "strong presumption" in Ohio law against the validity of promises for lifetime employment. *Meredith v. Rockwell Int'l Corp.*, 826 F.2d 463, 468–69 (6th Cir.1987); *Henkel v. Educational Research Council*, 45 Ohio St.2d 249, 344 N.E.2d 118, 121–22 (1976). Before enforcing such an agreement, an Ohio court will require a clear manifestation of the parties' intent to bind themselves to a lifetime employment contract. *Henkel*, 344 N.E.2d at 122.

Eyerman's evidence on this point consists primarily of statements Mary Kay Ash allegedly made. Specifically, Eyerman alleges that Ash told her of a plan to create pink nursing homes for retired national sales directors. Ash also allegedly asked the audience at a sales meeting if they wanted to receive a Cadillac every two years for the rest of their lives. Eyerman also relies on discussions with MKC representatives concerning retirement benefits available to national sales directors at age 65.

None of this evidence establishes a genuine issue of material fact as to the existence of a promise to continue indefinitely Eyerman's contract. Ash's statements amount, at most, to a pledge to provide Cadillacs every two years to national sales directors and to provide a nursing

---

8. Eyerman places heavy emphasis on the close personal relationship allegedly established between MKC and its sales force. However, Eyer- man admitted in her deposition that she spoke with MKC officials only a few times a year.

home for those who retire. Ash did not promise that any national sales director could be assured of remaining in that position until retirement. Similarly, the existence of a retirement program cannot reasonably be regarded as a promise to continue employment until retirement, especially given the strong presumption against such promises under Ohio law. We therefore affirm the grant of summary judgment against Counts IV and V.

### E.

Finally, Eyerman alleges in Count VIII that MKC has unjustly enriched itself since terminating her contract. Under the NSDA, Eyerman received a specified commission on sales made by members of her unit. MKC stopped paying Eyerman the commissions for sales made by the unit after the effective date of her termination. Eyerman contends that she is entitled to continue receiving those commissions.

An action for unjust enrichment will lie where a party retains money or a benefit that in equity or justice belongs to another. *Hummel v. Hummel,* 133 Ohio St. 520, 14 N.E.2d 923, 926–27 (1938). However, absent fraud, illegality, or bad faith, a plaintiff may not recover if the defendant retains the disputed money or benefit under the terms of an agreement between the parties. *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.,* 46 Ohio St.3d 51, 544 N.E.2d 920, 924 (1989); *Ullmann v. May,* 147 Ohio St. 468, 72 N.E.2d 63, 67 (1947).

The NSDA provides that "[u]pon termination of this Agreement any and all rights and privileges [Eyerman] has in regard to [her] activities under this Agreement shall terminate." Included among Eyerman's rights and privileges were the right to receive commissions from the sales of her unit.

This case is on all fours with *Ullmann.* In *Ullmann,* the defendant terminated the employment of the plaintiff, a salesman. The plaintiff brought an unjust enrichment claim for commissions on sales to those clients he had procured during his employment. The Supreme Court of Ohio held that the plaintiff could not recover the commissions because the employment contract stated that the plaintiff was entitled to the commissions only while the contract remained in effect. *Ullmann,* 72 N.E.2d at 66. The court acknowledged that the result was harsh, but stated that "courts do not relieve competent parties from an improvident agreement." *Id.*

Like the plaintiff in *Ullmann,* Eyerman signed a contract that terminated her right to receive commissions after the termination of the agreement. Absent fraud, bad faith, or illegality, she cannot recover in equity that which she contracted away to MKC. *Aultman,* 544 N.E.2d at 924. Since Eyerman has not alleged fraud, bad faith, or illegality in the making of the agreement, she has not established a genuine issue as to her right to recover the disputed commissions. Therefore, we affirm the grant of summary judgment against Count VIII.

AFFIRMED.