**Joann S. ALFRED, Plaintiff,**

v.

**TENNESSEE FARMERS MUTUAL INSURANCE COMPANY, Defendant.**

No. 3:96–CV–0614.

United States District Court, E.D. Tennessee.

March 31, 1997.

Gordon Ball, Knoxville, TN, for Plaintiff.

C. Eric Stevens, Trabue, Sturdivant & De-Witt, Nashville, TN, Edward K. Lancaster, Columbia, TN, for Defendant.

## MEMORANDUM OPINION

JORDAN, District Judge.

This civil action is before the court for consideration of the defendant's motion to dismiss or for summary judgment [doc. 4]. After an initial round of briefing in support of and in opposition to the motion, the parties litigated concerning whether the plaintiff should have discovery before consideration of the defendant's motion. In a memorandum and order filed on January 10, 1997 [doc. 25], the court treated the plaintiff's opposition to the defendant's motion for a protective order as a motion under Fed.R.Civ.P. 56(f), and allowed the plaintiff to take discovery within stated limits. The court then set the defendant's motion to dismiss or for summary judgment for a hearing on March 14, 1997.

The plaintiff elected to engage in only a portion of the discovery permitted by the court's January 10, 1997, memorandum and order. At the hearing on March 14, the plaintiff relied heavily on evidence obtained through discovery in a similar civil action, *Susan Vaughn Burns, et al. v. Tennessee Farmers Mutual Insurance Company,* heard by District Judge Hull of this court. Concerned that the plaintiff was relying in part on evidence not in the record in the case at bar, the court then allowed the plaintiff 10 days within which to supplement this record, and allowed the defendant 10 days afterwards within which to respond [*see* doc. 30]. The plaintiff has now supplemented her opposition to the defendant's motion [doc. 32]. The court finds it unnecessary to await the defendant's response to this supplemental material, the parties having had a full oppor-

tunity to brief and to argue the issues presented.

In this civil action, the plaintiff sues under Title VII of the Civil Rights Act of 1964, as amended, alleging that she was discriminated against by the defendant on the basis of her gender, in that the defendant refused to hire her or to contract with her as an agent. The plaintiff also stated a claim under 42 U.S.C. § 1981 and pendent Tennessee-law claims, but has since agreed that she will not prosecute these other claims. The court will therefore dismiss the plaintiff's claims under § 1981 and Tennessee law.

The basis of the defendant's motion is that it cannot have any liability to the plaintiff under Title VII because there never would have been established an employer-employee relationship between the defendant and the plaintiff. The defendant argues that all of its insurance agents are independent contractors, not employees, and that it therefore did not refuse to "hire" the plaintiff. For some examples of the evidence offered to support this argument [*see* doc. 5, attachments], the application form which the plaintiff completed and signed states at the top of the first page that it will be considered for no more than six months, and that after six months, "you must complete a new application for further consideration as an independent contractor agent." On this form, the plaintiff stated that her reason for wishing to leave her then-current employment with The Travelers Insurance Companies as a mass marketing customer service counselor was her "[d]esire to return to commissioned sales."

The Multi–Line Agency Manager's Agreement and the Multi–Line Agent's Agreement on the defendant's forms state expressly an intention to create an independent contractor relationship, not an employer-employee relationship. Other evidence submitted by the defendant in support of its motion shows that agency managers (as opposed to regional agency managers, who are employed by the defendant) and agents of the defendant are not paid salaries or wages, but earn their livings through commissions; that these agents are "captive" agents, placing most policies sold by them with the defendant only, except that they place substandard automobile insurance risks with one or more other carriers, and offer disability insurance underwritten by another insurance carrier; that in a Tennessee Farm Bureau insurance agency, secretaries are paid out of agents' commissions, as is office rent; that the defendant does not set the hours of agents' work; that agents pay for their own insurance agent examinations and licenses, own their own automobiles, and pay to fuel their automobiles; that agents pay their own expenses of membership in professional associations; that regional agency managers do not evaluate agents' work performance on any basis other than production; that the defendant maintains a sales force at its corporate headquarters, but does not maintain sales offices elsewhere in Tennessee; that the defendant does not prohibit its agents from selling insurance outside their counties, does not provide its agents with health insurance, vacations, sick leave, or other employment benefits, and does not provide errors and omissions insurance coverage for its agents; that agents of the defendant are permitted to incorporate, and some have; that the defendant places no minimum hours or office requirements on its agents; that the defendant does not provide its agents with stationery or business cards, but does provide copies of its uniform insurance application and policy forms; and that the defendant does not withhold income taxes from agents' earnings, does not pay any Social Security taxes for its agents, and does not provide IRS W–2 forms to its agents. According to Tom McDonald, the defendant's chief marketing officer,

> Agents and Agency Managers may sell lines of insurance other than TFMIC. Agents currently sell, or in the past have sold, lines not carried by TFMIC such as non-standard automobile insurance, bonds and disability income insurance. They may also write coverages for insureds that TFMIC chooses not to accept. Agents currently write, or have previously written, coverages through, among others, Atlanta Casualty, Progressive Insurance Company, Dairyland Insurance Company and Provident Insurance Company.

[Doc. 5, attachment: *Affidavit of John Thomas McDonald in Support of Defendant's Motion to Dismiss and for Summary Judgment* at 4.]

. Title VII, in 42 U.S.C. § 2000e–2(a)(1), renders it an unlawful employment

practice for an employer to fail or refuse to hire an individual because of such individual's sex. "Employee" is defined in the act to mean "an individual employed by an employer." 42 U.S.C. § 2000e(f). "Independent contractors are not protected by Title VII." *Knight v. United Farm Bureau Mutual Insurance Company,* 950 F.2d 377, 380 (7th Cir.1991) (citation omitted); *accord, Wilde v. County of Kandiyohi,* 15 F.3d 103, 104 (8th Cir.1994) (citation omitted).

> The determination of employment status is a mixed question of law and fact. Normally, a judge will be able to make this determination as a matter of law. However, where there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, ... the question is to be resolved by the finder of fact in accordance with the appropriate rules of law.

*Lilley v. BTM Corporation,* 958 F.2d 746, 750 n. 1 (6th Cir.), *cert. denied,* 506 U.S. 940, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992) (citation omitted) (decided under the Age Discrimination in Employment Act[1]); *accord, Simpson v. Ernst & Young,* 100 F.3d 436, 439 (6th Cir.1996) (*citing Lilley* ).

█ In its initial brief, the defendant devotes much of its argument to the point that the "economic realities" test used to decide the issue in *Lilley* is outdated after the Supreme Court's decision in *Nationwide Mutual Insurance Company v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), a case arising under the Employee Retirement Income Security Act of 1974, as amended.[2] In *Darden,* the Supreme Court seemed to indicate that courts should use traditional, common-law agency principles in cases arising under federal statutory law (or at least those in which the definitions of "employee" are similar to that in ERISA) for the purpose of distinguishing between employees and independent contractors. At least one federal court of appeals, in *Wilde v. County of Kandiyohi, supra,* has applied *Darden* in the Title VII context, and suggested that older Sixth Circuit authority applying the broader "economic realities" test first formulated under the Fair Labor Standards Act of 1938, *see Armbruster v. Quinn,* 711 F.2d 1332 (6th Cir.1983), is no longer good law after *Darden.*

In a very recent case arising under both the ADEA and ERISA and concerning the distinction between a partner and an employee, however, the Court of Appeals for the Sixth Circuit indicated that there is no substantive conflict between its earlier decision in *Lilley, supra,* and the Supreme Court's analysis in *Darden,* and applied both tests. *Simpson v. Ernst & Young, supra.*[3]

In *Lilley,* the court described the economic realities test as one which "looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself." 958 F.2d at 750 (citations omitted). "This test is a loose formulation, leaving the determination of employment status to case-by-case resolution based on the totality of the circumstances." *Id.* (citation omitted). In *Lilley,* the court of appeals upheld the submission of the issue to a jury and the jury's finding of an employment relationship, finding significant the facts that the plaintiff, a salesman compensated on straight

---

**1.** As the court noted in *Lilley,* 958 F.2d at 750 n. 2 (citations omitted), "The provisions of the ADEA generally receive an identical interpretation to corresponding provisions of Title VII." For this reason, ADEA cases such as *Lilley* can be helpful in addressing the employee/independent contractor issue in a Title VII case.

**2.** ERISA's definition of "employee" in 29 U.S.C. § 1002(6), "any individual employed by an employer," is similar to that used in Title VII.

**3.** In light of the decision in *Simpson v. Ernst & Young,* the authority of *Ware v. United States,* 67 F.3d 574 (6th Cir.1995), on which the defendant relies in its initial brief, is questionable in this case. In *Ware,* the court of appeals discussed and applied *Darden,* but did not expressly hold

that *Armbruster* and *Lilley* are no longer good law, or even mention *Armbruster* and *Lilley.* The issue in *Ware* was whether the insurance agent was an independent contractor, as opposed to an employee, for the purpose of deducting unreimbursed business expenses in calculating his federal income tax liability. The court noted that in deciding the issue of independent contractor versus employee, a court must take account of the context in which the distinction is raised: "[I]t seems clear that the relative weight given each factor may differ depending upon the legal context of the determination." 67 F.3d at 578. "The fact that the same test might produce disparate results in different contexts merely reveals that the employer-employee relationship is complex, even under traditional rules of agency." *Id.* (footnote omitted).

commission, did not make an investment in the defendant's business; that the defendant retained the authority to remove the plaintiff from particular sales; that the defendant required the plaintiff to obtain the defendant's approval before quoting a price to a potential buyer; that the defendant supplied the plaintiff with office supplies, an office, and secretarial services; that the plaintiff "was integrated into [the defendant's] normal business operations;" and that the plaintiff sold only the defendant's products. *Id.*

In *Simpson v. Ernst & Young*, the court of appeals stated that

> *Lilley*, like *Darden*, defines the underlying common denominator of the employer/employee rubric as the employer's ability to control job performance and employment opportunities of the aggrieved individual as the most important of many elements to be evaluated in resolving the issue after assessing and weighing all of the incidents of the relationship with no one factor being decisive. . . .

100 F.3d at 442 (citations omitted). According to the *Simpson* court, some of the *Darden* factors to be considered are

> the hiring party's right to control the manner and means by which the product is accomplished; the skill required by the hired party; the duration of the relationship between the parties; the hiring party's right to assign additional projects; the hired party's discretion over when and how to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the hiring party's regular business; the hired party's employee benefits; and tax treatment of the hired party's compensation.

*Id.* at 443 (citation omitted).

In *Susan Vaughn Burns, et al. v. Tennessee Farmers Mutual Insurance Company*, civil action no. 2:93–CV–391, mem. op. filed Jan. 20, 1995, at 6, a similar case, District Judge Hull of this judicial district held, citing *Armbruster, supra,*

While the Court recognizes that Tennessee Farmers' General Agents are independent contractors as a matter of common law, this does not necessarily mean that they have no protection under Title VII. The reality of the situation is that Tennessee Farmers controls a large number of very good General Agent job opportunities from which one can progress to lucrative Regional Agency Manager positions. Because of Tennessee Farmers' subjective practices for selecting its General Agents, women have been effectively excluded from both of these positions. In other words, they have been subjected to the very harm Title VII was intended to prevent. Accordingly, the Court FINDS that Title VII does apply to this situation.

The undersigned respectfully declines to accept this ruling as precedential in this case. While the *Burns* decision might properly, in accordance with *Armbruster*, have taken into account Title VII's remedial purpose, the memorandum opinion contains little of the examination of the relevant factual circumstances required by either *Lilley* or *Darden*. That a business entity might have kept its sales force predominantly male does not, standing alone, invoke jurisdiction under Title VII; the issue is whether the sales force is employed by or contracts with the business entity. In this case, applying the proper standards under Fed.R.Civ.P. 56 and treating all of the evidence submitted by the plaintiff as true, the court finds as a matter of law that had the plaintiff obtained the agency position she wanted, she would have been an independent contractor, not the defendant's employee, for the purposes of Title VII. This is consistent with Judge Hull's determination in *Burns, supra*, that the defendant's "General Agents are independent contractors as a matter of common law."

In spite of her reliance on *Armbruster*[4], the plaintiff organizes her argument in opposition to the defendant's motion according to factual and circumstantial elements made relevant by *Lilley* and *Darden*.[5] The court will

---

**4.** The plaintiff's citation to *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213 (6th Cir.1992), to argue that *Armbruster* is still good law ignores the fact that *Eyerman* arose under Ohio statutory antidiscrimination law, not federal law. The court of appeals' discussion in *Eyerman* of the economic realities test is abbreviated, *id.* at 218–19; the court cited *Darden* and *Lilley* in a brief footnote. *Id.* at 219 n. 5.

**5.** See, for example, the list of 14 factors in the plaintiff's supplemental brief [doc. 28].

address some of these arguments in roughly the order and manner in which the plaintiff presents them. Control of job performance and employment opportunities being the most important factor as a matter of law, the court will address this one first.

As stated above, the defendant's evidence submitted in support of its motion shows that this defendant does not control in many respects its agents' conduct of the business of selling insurance. Agents can write business outside their counties, although the defendant does not encourage this. The defendant looks to its agents' production, as opposed to their hours of attendance at their offices. In this sense, the defendants' agents are not integrated into the defendant's normal business operations, as was the plaintiff in *Lilley*. There is no evidence here, as there was in *Lilley*, that the defendant removes agents from particular sales, or requires agents to obtain approval from the defendant before quoting prices. This latter factor, of course, has little applicability in the context of sales of standard insurance policies at standard or predetermined premium rates. It is true that the defendant's underwriters can decline on behalf of the defendant to accept a risk disclosed by an application for insurance obtained by an agent.

The plaintiff concedes that the defendant's agents may sell insurance out of their homes, but says that otherwise, the defendant exerts substantial control over the locations of its agents' offices. The proof shows that the defendant's agencies lease space in county farm bureau offices; the farm bureaus and the insurance agencies share clerical staffs. There is a substantial business justification for this arrangement. County farm bureaus are members of the Tennessee Farm Bureau Federation.[6] The defendant markets its property and casualty insurance to members of such farm bureaus. An agency dependent to a very great extent on walk-in business is wisely located in the same premises as the organization the members of which comprise the agency's customer base.

The defendant's agents are captive agents in the sense that they do not sell insurance policies which compete with the defendant's policies, and the plaintiff relies on this fact heavily. An insurance agent's status as a captive agent, however, is no more determinative of the issue presented than, for example, a manufacturer's representative's agreement to market the manufacturer's products exclusively. *See Oestman v. National Farmers Union Insurance Co.*, 958 F.2d 303 (10th Cir.1992) (court affirmed an award of summary judgment finding no jurisdiction under the ADEA in a case in which the plaintiff insurance agent's contract with the defendant insurer prohibited the agent or any member of his immediate family residing at home from soliciting or selling other insurance without the defendant's and a general manager's consent). Furthermore, as stated above, the defendant's agents are not entirely captive; many sell non-competing policies issued by a variety of insurers.

With respect to the factor of the skill required on the part of the employee or independent contractor, the plaintiff points to evidence that individuals have been engaged as agents of the defendant without first having the licensure necessary to sell insurance in Tennessee. This factor should not be so narrowly construed. The question presented by the factor is whether the work performed is of an unskilled nature, generally performed in a factory or office setting under managerial supervision, or is more skilled work involving individual initiative and the exercise of some personal discretion. It is clear that the work in question here, selling insurance, is of the latter kind.

Under the "source of instrumentalities and tools" factor, the plaintiff attempts to show the existence of a genuine issue of fact by showing that the plaintiff's applications and policies are on uniform forms provided by the defendant. This is a fact which the defendant does not dispute; applicable insurance laws and regulations do not permit the defendant's agents to sell for the defendant negotiated, individualized policies. The more relevant question here is who supplies what is used in the course of selling the defendant's policies, and the evidence shows that agencies pay for their own stationery and office

---

6. *See* Tennessee Code Annotated §§ 43–22–101 through 43–22–104 concerning the Tennessee Farm Bureau Federation and use of the words "farm bureau".

supplies, and that agents supply their own motor vehicles.

The *Deposition of Steve Hamblen,* February 13, 1997, at 31–32 [doc. 29], does not, contrary to the plaintiff's argument, show that the defendant's agents are required to purchase their errors and omissions (E & O) insurance from the defendant. This testimony shows merely that agents of the defendant do purchase their E & O coverage from the defendant and pay the premiums for it through deductions from commissions due them. That the defendant might be able to offer E & O insurance at competitive rates to individuals whom it has approved to represent it is neither surprising nor indicative of an employment relationship.

The plaintiff attempts to use the defendant's agents' status as captive (or partially captive) insurance agents to show that the defendant retains the right to assign additional projects to its agents. This is a *non sequitur.* The evidence shows that the defendant's agents are engaged to sell insurance and to meet certain production requirements in doing so. There is no evidence that the defendant directs its agents to perform other business functions which are performed by admitted employees, such as underwriting and claims adjustment.

The plaintiff focuses on how the defendant's agents are paid, but this evidence fails to show a genuine issue of fact in the plaintiff's favor. Many of the defendant's agents deposed in the *Burns* litigation were unable to state precisely the percentages by which their commission incomes were calculated, but their testimony was consistent that in an agency of the defendant, the agency manager and the agents earn their incomes through some method of dividing earned commissions, with, in most counties at least, the agency manager taking a portion of the commissions earned by the agents working under him or her. The fact that the defendant calculates commissions for its agencies and deducts expenses from these commissions shows nothing more than the provision of centralized financial accounting services and a system in which an insurer does not depend on its agents to turn over net premium income earned for policies already issued. It is no surprise that the defendant handles the gross income received for risks which it has

already underwritten. The potential for disputes concerning how commissions are divided within an agency does not at all tend to show that the defendant is its agents' employer; an individual agent's dispute in this regard would be with his or her agency manager.

The evidence shows that a new agent of the defendant is "carried" to an extent by his or her agency manager for the first year. During this period, the new agent is paid a flat amount plus any commissions he or she earns from sales of life insurance, and the agency manager has a corresponding reduction in his or her share of the total commissions earned from sales of property and casualty insurance. [*See* doc. 29 at 33–34.] Mr. Hamblen, the Knox County agency manager, did not deduct for federal income tax purposes the amounts paid to new agents under this regime [*see id.* at 47], and the plaintiff argues the existence of an employment relationship between the new agents and the defendant on the basis of this fact. The court will not assume that Mr. Hamblen or any similarly situated agency manager would have had a federal income tax deduction in such a case, the agency manager and the new agent in each such case being obliged to recognize as income the full amounts of the commissions received by them, and no agency manager in this case claiming to have been a new agent's employer. Even if Mr. Hamblen was less than sophisticated about his income tax returns, however, it is difficult to see how his conduct in this regard, there being no proof that the defendant directed him as to how to complete his income tax returns, rendered the defendant the new agents' employer.

Evidence in this record shows that new agents are sometimes engaged to work in agencies away from their homes, and so move to other counties to work as agents of the defendant, and that some agents have left agencies to work in other agencies. This establishes nothing other than that the defendant's agency managers and agents communicate with one another about income-producing opportunities, and that some agents have been mobile in seeking such opportunities. The defendant understand-

ably has some input, through its employed regional agency managers, into who becomes an agent of the defendant and how that agent is treated financially by his or her agency manager, given the view that the agents contract directly with the defendant, but the plaintiff's evidence falls short of showing employment-type control of these matters. Mr. Hamblen testified,

> Q. Who makes the decision on what—how much commission to take, then? The agents don't make that decision, do they?
>
> A. No, me and the regional manager.
>
> Q. The regional manager works for Tennessee Farmers?
>
> A. He and I talk about it, but the basic decision is mine.
>
> Q. But you discuss it with his input—you couldn't take—you couldn't come in and take it all, could you, Mr. Hamblen?
>
> A. No. He wouldn't let me.
>
> Q. Tennessee Farmers Insurance Company wouldn't let you do that, would they?
>
> A. No.

[Doc. 29 at 23.] Wayne Williamson, the Cocke County agency manager, testified [doc. 32, attachment: *Deposition of Wayne Williamson,* January 20, 1994, at 17–18]:

> Q. Did you make the decision that John Teague—or could you make the decision, Mr. Williamson, that John Teague become a special agent?
>
> A. No.
>
> Q. Who made that decision?
>
> A. That's sort of a mutual thing, you know. They don't run over me and I can't run over them.
>
> Q. Now, you're talking about "they", you're talking about Tennessee Farmers Mutual Insurance Company?
>
> A. Right.
>
> Q. And you say it's a mutual decision?
>
> A. Well, I can't do it alone and they don't either.
>
> Q. And they can't do it alone, is that what you're saying?
>
> A. Right.

Freeman Buckner, the Blount County agency manager, testified [doc. 32, attachment: *Deposition of Freeman Buckner,* May 20, 1994, at 22], "Being the agency manager in this county, all of the commissions are assigned to me. I'm responsible for soliciting new business and helping to select and qualify the agents that we feel that are better suited, you know, for our county."

In summary, this evidence, like the other evidence in the record, is consistent with the defendant's position that it contracts with its agency managers and agents as independent contractors, and that it contracts with agency managers to exercise managerial responsibilities which the ordinary agents do not have, but that the ordinary agents contract with the defendant, not with the agency managers in their respective counties. The plaintiff cites trips awarded to agents for high sales volumes as evidence of an employment relationship, but the balance of the evidence concerning how agents earn their incomes and how the defendant treats its agents with respect to benefits and taxation matters is squarely against the plaintiff on this point. Application of the *Lilley* and *Darden* factors leads the court to conclude that there is no genuine issue in this case concerning the status of the defendant's insurance agents as independent contractors, and that the defendant is therefore entitled to summary judgment dismissing the plaintiff's Title VII claim. The court will accordingly enter an order dismissing this civil action.

### *ORDER*

For the reasons stated in the court's memorandum opinion filed with this order, the court finds the defendant's motion to dismiss or for summary judgment [doc. 4] well taken, and it is **GRANTED.** It is **ORDERED** that this civil action is **DISMISSED.**