NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0494n.06
Case No. 24-3148

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Dec 05, 2024

KELLY L. STEPHENS, Clerk

BURGER MANAGEMENT SYSTEMS
WASHINGTON INC., et al.,

  Plaintiffs-Appellants,

    v.

SEAWEND, LTD, et al.,

  Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF
OHIO


OPINION

---

Before: BATCHELDER, GRIFFIN, and WHITE, Circuit Judges.

  **ALICE M. BATCHELDER, Circuit Judge.** In this lawsuit for breach of contract and related claims, the plaintiffs challenge the district court's award of summary judgment to the defendants, claiming the court erred by holding that the plaintiffs—as assignees of the contract—stand in the shoes of the assignor for purposes of pressing those claims. We AFFIRM.

**I.**

  This case starts with a contract for the sale (purchase) of a business. The sellers were Seawend, Ltd. and certain contract guarantors: Cedar Enterprises Inc., David Karam, and James Karam (collectively "Seawend"). The business comprised 52 Wendy's restaurant franchises in the greater Seattle, Washington, area that Seawend operated under franchise agreements with a separate Wendy's corporate entity. Here, Wendy's Properties LLC (hereinafter "Wendy's"), which is not a party to this lawsuit, was an intermediary in the sale, contracting with Seawend but assigning the purchase to Burger Management Systems Washington Inc. and SMS Holdings

Corporation (collectively "Burger") just before the sale closed. In this lawsuit, Burger is the plaintiff and Seawend is the defendant.

On March 17, 2017, Seawend and Wendy's entered the Asset Purchase Agreement ("APA") (a 220-page contract with over 100 provisions and dozens of exhibits and schedules), through which Seawend would sell the 52 franchises to Wendy's for $64,793,494. As relevant here, the APA contained a certain "Representations and Warranties" provision:

> Litigation and Other Actions. *Except as set forth in Schedule 3.16*, there are no pending or, to the Knowledge of [Seawend], threatened Actions arising out of or related to the Business, the ownership or use of the Assets or the transactions contemplated by this Agreement and the other Transaction Agreements and, to the Knowledge of [Seawend], there are no conditions, events or incidents that could reasonably be expected to form the basis of any such Actions.

APA § 3.16 (underlining omitted; italics added). As for those exceptions, Seawend identified several items in the APA's attached Schedule 3.16, including the one at issue here: "Site #1553 – Possible condemnation (SWL #109 – Address: 2216 South 320th Street, Federal Way, WA)." A separate APA subsection asserted:

> [Seawend has not] received *any written notice* of *any* pending or threatened condemnations, planned public improvements, annexation, special assessments, zoning or subdivision changes, or similar adverse actions or claims affecting the Real Property and, to the Knowledge of [Seawend], there are no facts or circumstances that would give rise to the delivery of any such notice.

APA § 3.09(d) (emphasis added). To sum this up, Seawend disclosed in the APA that it knew of a "possible condemnation" at Site 1553, but that it was unaware of and had not received any written notice of any *pending or threatened* condemnation. Bear in mind that this was one of 52 franchise locations, i.e., real properties. Seawend owned some but leased most of them, some from third-party landlords and others directly from Wendy's. Site 1553 was a "Wendy's-Owned Property," APA Exhibit A, meaning that Seawend was a tenant leasing the Site 1553 real property from property-owner Wendy's, APA § 2.02(c).

2

On March 19, 2017, Wendy's attorney Kirk Vidra requested "the condemnation notice for Site #1553." Laura Wallerstein, Seawend's deal counsel, responded that "[e]verything our clients have heard about site 1553 has been verbal."

On April 11, 2017, Sound Transit, Seattle's municipal public transit authority, sent a letter to Wendy's, as the Site 1553 owner, giving Wendy's notice that it was intending to acquire certain real property for the extension of its light rail system; that it would be conducting a public meeting on April 27, 2017, about such acquisitions; and that Site 1553 "will be impacted by the . . . project." Wendy's received that letter on April 18, 2017. Sound Transit did *not* send a copy of that letter, or any equivalent notification, to Seawend. During discovery, Sound Transit provided a log of its activities concerning Site 1553, and the letter to Wendy's was the first record of any action. On April 19, 2017, Sound Transit sent a letter to a Seawend employee (David Antis), requesting permission to enter Site 1553 to collect information.[1] Neither Wendy's nor Seawend amended the APA (Schedule 3.16 or otherwise) to add any of this information.

On April 28, 2017, Robert Holland, Burger's deal counsel, told Wallerstein that he "would like to see any communications regarding the condemnation threat."[2] Based on what James Evans, the then-President of Seawend's parent company, had told her, Wallerstein responded that Site 1553 "is a Wendy's owned site; No written notice has been received by Seawend. The client reports that all information has been delivered verbally." The undisputed evidence shows that

---

[1] David Antis, who currently works for Burger, worked for Seawend from 2008 until April 2017. In a sworn declaration for this lawsuit, Antis attested that he "received some communications related to a potential condemnation" of Site 1553, and he cited two specific letters and three emails. But at his deposition, Antis testified that, before the APA closed, "to the best of [his] recollection," the Sound Transit expansion and the Site 1553 condemnation were still just a "possibility," and he believed Sound Transit was still considering "different options," some of which would not have led to the condemnation of Site 1553.

[2] Burger alleges in its non-verified Complaint that it began negotiations with Wendy's some time in December 2016 or January 2017. There is no evidence in the record that confirms the precise timing of those negotiations, but Burger's deal counsel was participating in deal conversations in March 2017.

Wallerstein herself never received any documents related to Site 1553, and that Holland never specifically asked about the identity of the possible condemning authority.

On May 5, 2017, Wendy's and Burger entered a contract (titled "Assignment and Assumption of Asset Purchase Agreement"), in which Wendy's assigned its rights and obligations under the pending APA; Seawend was not a party to that contract. On May 8, 2017, Seawend and Wendy's formally closed on the APA; Burger was never a party to the APA. Just after Seawend and Wendy's closed on the APA, Burger learned that Sound Transit intended to conduct a full taking of the Site 1553 property.

In the APA, Seawend and Wendy's determined the total sale price based in large part on the values of the individual franchises, and they valued the franchise at Site 1553 at $2,507,750 based on its past earnings and a business valuation multiple. But the Wendy's Vice President involved in the APA later testified at a deposition that if he had realized the condemnation was forthcoming, Wendy's would have valued Site 1553 at "zero," and he further opined that "we would have just taken it out of the transaction."

Burger operated Site 1553 from May 2017 until it closed in May 2020, during which it generated $892,082 in earnings.[3] In May 2020, rather than proceed through condemnation, Wendy's voluntarily sold the property to Sound Transit, causing Burger to close the franchise. Sound Transit appears to have paid Wendy's $4,125,000 for the property.[4] In July 2020, Sound Transit paid Burger $375,644 in connection with the sale. And in August 2020, Wendy's settled with Burger concerning the franchise agreement by paying Burger $750,000 and agreeing to

---

[3] According to a financial statement that Burger produced for the deposition of James Evans, the President of WTC Ventures (Burger's parent company), Site 1553 had an operating profit of $892,082 in EBITDA (earnings before interest, taxes, depreciation, and amortization) over this three-year period.

[4] This value comes from entries in Sound Transit's activity log, which note Wendy's willingness to accept $4,125,000, followed by the Sound Transit agent's notation that she would recommend settlement at that amount.

transfer the remaining term of the Site 1553 franchise agreement to a new restaurant, effectively waiving the $40,000 new franchise fee. So, adding all of this together, Burger received at least $2,057,726 from its operation of the franchise at Site 1553. Burger also received from Wendy's a brand new, replacement franchise location near Site 1553.

But in March 2021, Burger sued Seawend, claiming Seawend had concealed the eventual condemnation by failing to provide related documents or name the condemner. The complaint had six claims: (1) breach of contract, (2) breach of guarantee, (3) fraudulent inducement, (4) fraudulent or negligent misrepresentation,[5] (5) unjust enrichment, and (6) civil conspiracy. Pursuant to APA § 11.07, Ohio law was to govern the lawsuit. After discovery, both parties moved for summary judgment, and the district court granted summary judgment to Seawend. *Burger Mgmt. Sys. Wash. Inc. v. Seawend, Ltd.*, No. 2:21-cv-1134, 2024 WL 278567 (S.D. Ohio Jan. 24, 2024).

## II.

We review a grant of summary judgment de novo. *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To ward off summary judgment, the nonmoving party must "present sufficient evidence to permit a reasonable jury to find in its favor." *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 805 (6th Cir. 2020) (citation omitted).

First and foremost, Burger, as an assignee, has no greater rights than Wendy's, the assignor. *Cook v. ProBuild Holdings, Inc.*, 17 N.E.3d 1210, 1219 (Ohio Ct. App., Aug. 14, 2014) ("Under

---

[5] The district court granted summary judgment on the negligent-misrepresentation claim because negligent misrepresentation requires "a special relationship" between the plaintiff and defendant, whereas this was an ordinary arms-length transaction. *See Carter-Jones Lumber Co. v. Oro RB SPE Owner, LLC*, No. 2:20-cv-04894, 2021 WL 2592531, at *13 (S.D. Ohio, June 24, 2021) (citation omitted). Burger abandoned this claim on appeal.

Ohio law, . . . an assignee stands in the shoes of the assignor and can obtain no greater rights against another than the assignor had." (quotation marks and citation omitted)). Burger cites two completely dissimilar cases from bankruptcy law (one from a bankruptcy court and the other from the Seventh Circuit) to argue that the assignor's knowledge cannot be imputed to the assignee. But that is not the law generally, nor the law of Ohio specifically. Under the actual law, the assignor's knowledge is imputed to the assignee, *see Mertens v. Dever*, 2006-Ohio-1001, ¶ 16 (12th Dist.) (applying this rule to reject a fraudulent misrepresentation or concealment claim), and therefore Burger can prevail on its claims here only if Wendy's could prevail on those claims.

Wendy's could not prevail on a breach-of-contract claim because Wendy's knew about Sound Transit's plans for condemnation. A defendant cannot breach a contract by failing to disclose facts already known to the plaintiff. *Bechtel v. Turner*, 157 N.E.3d 333, 347-48 (Ohio Ct. App. 2020); *cf. Elite Designer Homes, Inc. v Landmark Partners*, 2006-Ohio-4079, ¶ 54 (9th Dist.). Burger insists that the notice in Schedule 3.16 was insufficient because it did not name Sound Transit as the condemner or reveal the prior inquiries from Sound Transit. But Burger does not explain how the APA's Schedule 3.16 notice of "possible condemnation," vague as it may be, did not give Wendy's (and therefore Burger) sufficient notice that Site 1553 was subject to foreseeable condemnation, or how more detailed information would have caused Wendy's (or Burger) to change its conduct. *See Saxe v. Dlusky*, 2010-Ohio-5323, ¶ 48 (10th Dist.). Nor does it even acknowledge—much less overcome—the fact that Wendy's had far better information than Seawend, given that Sound Transit sent the notification letter directly to Wendy's, while Seawend had no information suggesting that condemnation was probable, as opposed to merely possible. *See Loomis v. Troknya*, 846 N.E.2d 101, 105–06 (Ohio Ct. App. 2006).

The district court granted summary judgment on the breach-of-guarantee claim because that claim depended on, or was functionally the same as, the breach-of-contract claim, which

failed. Burger did not address this claim in its brief other than to say it was not waiving it. Regardless, because the breach-of-contract claim fails, the guarantee claim likewise fails.

Burger raised certain other claims, sounding in tort. But despite this creative pleading, Burger has alleged no damages independent of the contract claim, and no tort claims would exist but for the APA (and Wendy's assignment of it to Burger), so this is a breach-of-contract action. *See Am. Synthetic Rubber Corp. v. Louisville & N.R. Co.*, 422 F.2d 462, 466 (6th Cir. 1970).

Like the breach-of-contract claim, the fraudulent inducement claim fails because Wendy's knew about the condemnation. Therefore, Seawend could not have fraudulently induced Wendy's into entering the APA by concealing the condemnation. *See Bechtel*, 157 N.E.3d at 346-47; *Mertens*, 2006-Ohio-1001, ¶ 16. And Burger cannot show that Wendy's justifiably relied on any fraudulent misrepresentation. *See Jones v. Gilbert*, 210 N.E.3d 689, 696 (Ohio Ct. App. 2023) ("A buyer's reliance on a seller's fraudulent misrepresentation or concealment is not justifiable, as a matter of law, where undisputed evidence demonstrates that the buyer had other sufficient notice of the issue before closing on the home." (quotation marks, editorial marks, and citation omitted)).

The fraudulent misrepresentation claim, which Burger attempts to differentiate from its other claims by arguing that Seawend made "fraudulent misrepresentations directed to" Burger, fares no better for two reasons. First, because the undisputed evidence shows that the documents Seawend had in its possession communicated only a possibility of condemnation—the same information Seawend communicated to Burger—Burger has not shown that any withheld information was material. *See Saxe*, 2010-Ohio-5323, ¶ 48. And materiality is an element of a fraudulent misrepresentation claim. *Wuliger v. Cannella Resp. Television, Inc.*, 865 F. Supp. 2d 836, 844 (N.D. Ohio 2011). Second, Burger has not shown that Seawend intended to mislead it— another necessary showing—because nothing in the record suggests that either Evans or Wallerstein knowingly made false representations in response to Burger's inquiries. *See Goddard*

*v. Stabile*, 924 N.E.2d 868, 874 (Ohio Ct. App. 2009); *Indiana Ins. Co. v. Midwest Maint., Inc.*, 174 F. Supp. 2d 678, 681 (S.D. Ohio 2001).

Finally, the unjust-enrichment claim fails due to the contract and the absence of any fraud, illegality, or bad faith in the formation of that contract. *See Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 222 (6th Cir. 1992). And the civil-conspiracy claim fails due to the absence of any "unlawful act." *See Woods v. Sharkin*, 192 N.E.3d 1174, 1200 (Ohio Ct. App. 2022).

**III.**

For the forgoing reasons, we AFFIRM the judgment of the district court.