**KRAFT CONSTRUCTION COMPANY, Appellant and Cross–Appellee,**

**v.**

**CUYAHOGA COUNTY BOARD OF COMMISSIONERS**
**et al., Appellees and Cross–Appellants.**

[Cite as *Kraft Constr. Co. v. Cuyahoga Cty. Bd.*
*of Commrs.* (1998), 128 Ohio App.3d 33.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 72095.

Decided May 26, 1998.

34

36

*Thomas G. Lobe,* for appellant and cross-appellee.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, *Saundra Curtis–Patrick* and *Ronald K. Riley,* Assistant Prosecuting Attorneys, for appellees and cross–appellants.

---

JAMES M. PORTER, Presiding Judge.

Plaintiff-appellant/cross-appellee Kraft Construction Company ("Kraft") appeals from a directed verdict in favor of defendants-appellees/cross-appellants Cuyahoga County Board of Commissioners and the Sanitary Engineering Division of the County Department of Community Services (collectively "the county") arising out of Kraft's claims that the county was liable in conversion and trespass for its use of a sewage pumping station constructed by Kraft. The county cross-appeals contending that the trial court erred in awarding damages for unjust enrichment to Kraft against the manifest weight of the evidence and in its rulings on the admission of evidence and instructing the jury. We find no reversible error and affirm the judgment below.

This case originated when Kraft filed suit against the county in September 1995, alleging trespass, conversion, and unjust enrichment in connection with the county's use and maintenance of the Glen Eden pump station constructed and owned by Kraft in Highland Heights. Kraft requested injunctive relief to prevent the county from continuing to use the pump station as part of its sewage system. The court denied this request, and the parties agreed to maintain the

*status quo* until the case was resolved. The evidence at trial revealed the following matters.

Kraft purchased undeveloped land in Highland Heights in the late 1980s for the purpose of developing it into one hundred thirty sublots for single-family homes in the Glen Eden subdivision. Highland Heights imposed requirements for sanitary sewer connections and access to utilities for subdivision development. Kraft hired CT Consultants, an engineering firm, to act as intermediaries with Highland Heights and the county sanitary engineer. There were numerous meetings and extensive discussions between and among the interested parties regarding how the new development would fit in the Highland Heights/county sanitary sewer system.

CT Consultants developed a plan and made presentations to the county sanitary engineer and Highland Heights, submitting four alternative proposals regarding how the development could tie into the sanitary sewer system. At some point it was determined that the Franklin pump station, which had been built in 1960 and was already servicing three hundred forty existing homes in the vicinity of the new development, was inadequate to handle the additional flow to be generated by the homes in the proposed new subdivisions. Kraft was advised by the county that the new Glen Eden pump station would have to be provided, at Kraft's expense, in order to obtain approval for development of the subdivision.

In March 1988, CT Consultants sent a letter to the county, proposing to build the Glen Eden pump station on a parcel of land owned by Kraft in order to service the lots in the new subdivisions and the existing customers serviced by the Franklin pump station. Kraft proposed to use the eight-foot Franklin force main and to eliminate the Franklin pump station, which had overflow problems. The preliminary estimated cost for the new pump station to serve the proposed lots was $380,000. This proposal was approved by the county and Highland Heights.

It was at all times understood by the parties that the county sanitary engineer would operate and maintain the pump station as it did thirty-eight other pump stations in Cuyahoga County. Kraft was promised the right to remove the pumps, generators, controls, and other personal property items inside the Glen Eden pump station (known as "salvage rights") when its use was eliminated by construction of gravity sewers down Highland Road. There was evidence that the Highland Road gravity sewers would eliminate the need for the new Glen Eden pump station. Plaintiff's evidence indicated that new gravity sewers were projected for construction in 1994. After the new Glen Eden pump station went on line, ownership was to be transferred by warranty deed to the county, which would take over the operation and maintenance.

Over two years passed from the completion of the Glen Eden pump station (January 1991) and despite numerous conversations and letters exchanged between the parties, a written operating and maintenance agreement and warranty deed were not executed. During this period, the county operated and maintained the new pump station, but the real estate taxes on the parcel where the pump station was located remained unpaid and were billed to Kraft, which owned the fee. Kraft was advised that the county would not accept transfer of the property until all real estate taxes were paid.

On July 15, 1992, Kraft returned an executed Glen Eden pump station agreement to the county, but the county refused to execute the agreement due to the unpaid real estate taxes. Eventually, the county treasurer initiated a foreclosure action seeking payment of the delinquent real estate taxes. Kraft paid the delinquent real estate taxes and costs of the foreclosure litigation (totaling $12,000) and filed the instant action against the county.

The case proceeded to trial before a jury. At the conclusion of Kraft's case, the court granted the county's directed verdict motion on the trespass and conversion claims. The trial court allowed the case to continue to be heard by the jury. At the end of all the evidence, the trial court advised the parties that although the *quasi*-contract claim was equitable in nature, he was going to submit the case to the jury in an advisory capacity. The parties did not object to this procedure.

The jury returned a unanimous verdict for Kraft on the unjust enrichment count for $512,000. The court subsequently issued its findings of fact and conclusions of law generally consistent with the jury's advisory verdict. The court awarded unjust enrichment damages of $306,594 to Kraft; ordered the real estate transferred to the county, subject to Kraft's salvage rights on abandonment that it valued at $200,000; and required the county to disgorge the real estate taxes paid by Kraft since January 1990 with ten percent interest. Kraft filed a timely appeal from the court's directed verdict ruling on the conversion and trespass issues. The county defendants cross-appealed on the court's decision awarding damages to plaintiff for unjust enrichment.

This timely appeal and cross-appeal ensued.

Kraft's sole assignment of error states as follows:

"Whether the trial court erred to the prejudice of the appellant-plaintiff by entering a directed verdict in favor of defendants on count two of the complaint alleging conversion and trespass."

Civ.R. 50(A) provides in pertinent part as follows:

"(4) When granted on the evidence. When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most

strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

A motion for directed verdict requires the trial judge to construe the evidence most strongly in favor of the party against whom the motion is directed. The motion should be sustained only if reasonable minds can come to but one conclusion, and the conclusion is adverse to the nonmoving party. *Wise v. Timmons* (1992), 64 Ohio St.3d 113, 592 N.E.2d 840. Where reasonable minds may reach differing conclusions, the motion must be denied. *Ramage v. Cent. Ohio Emergency Serv., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828.

This court outlined the essential elements of conversion as follows in *Tabar v. Charlie's Towing Serv., Inc.* (1994), 97 Ohio App.3d 423, 427–428, 646 N.E.2d 1132, 1136:

"Conversion is the wrongful control or exercise of dominion over property belonging to another inconsistent with or in denial of the rights of the owner. *Bench Billboard Co. v. Columbus* (1989), 63 Ohio App.3d 421, 579 N.E.2d 240; *Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.* (1985), 24 Ohio App.3d 91, 24 OBR 160, 493 N.E.2d 289. In order to prove the conversion of property, the owner must demonstrate (1) he or she demanded the return of the property from the possessor after the possessor exerted dominion or control over the property, and (2) that the possessor refused to deliver the property to its rightful owner. *Id.* The measure of damages in a conversion action is the value of the converted property at the time it was converted. *Brumm v. McDonald & Co. Securities, Inc.* (1992), 78 Ohio App.3d 96, 603 N.E.2d 1141."

Kraft alleged that the county converted the Glen Eden pump station to its own use. However, there was substantial evidence adduced during plaintiff's case that it was the understanding of the parties throughout their relationship that the new Glen Eden pump station would be turned over to, and operated and maintained by, the county after it was built by Kraft.

It is undisputed that the station was operated and maintained by the county after it came on line in January 1991, with the acquiescence, if not consent, of Kraft. Thomas Ackerman, Kraft's principal, testified that Kraft did not pay any expenses for operation, repair, or maintenance at the pump station after it became operational in 1991. Ackerman admitted that the telephone and electrical meters were installed by the county and that it paid the bills. He went on to admit that it was never the intention of Kraft to operate and maintain the Glen Eden pump station after it was constructed. He further conceded that it was

understood that the county sanitary engineer would operate and maintain the pump station after it was built. Kraft never tried to keep the county out of the property until the lawsuit was filed.

The trial court properly found on this evidence and from the whole record that, as a matter of law, defendants were entitled to a directed verdict on the conversion claim. The tort of conversion requires dominion or control wrongfully asserted over personal property. There would not be wrongful dominion or control where the plaintiff's principal officer admits that it was the intention of all concerned that the county would exercise dominion or control over the property. Clearly, from Ackerman's testimony the court understood that the county sanitary engineer would operate the pump station, as it was legally authorized to do, and as it did with thirty-eight other stations in the system. This function was never contemplated by the parties to be carried out by the plaintiff. From the time the pump station became operational, the county sanitary engineer and Kraft acted as if there was an easement or license that allowed the county access to the facility to operate and maintain it. Plaintiff accepted this arrangement and, until the filing of this lawsuit, never attempted to exclude the county from the facility or contest the county's use of the facility. Given these admissions from the plaintiff, we find no error in the directed verdict for the county on the conversion claim.

For the same reasons given above, we find that the trial court properly determined, as a matter of law, that the county sanitary engineer did not trespass on the plaintiff's property. The definition of "trespass" was set out in *Linley v. DeMoss* (1992), 83 Ohio App.3d 594, 598, 615 N.E.2d 631, 633–634:

"A common-law tort in trespass upon real property occurs when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby damages directly ensue, even though such damages may be insignificant. See, generally, 88 Ohio Jurisprudence 3d (1989) 579–581, Trespass, Sections 1–2. The act of consensual entry may be intentional or negligent. * * *"

The sanitary engineer's personnel routinely entered the premises of the Glen Eden pump station for maintenance and repair purposes. Kraft never tried to stop them until this suit was filed. There was testimony that when the pump station first went on line there were many engineering problems that had to be corrected by the project engineer. The repair and maintenance functions mutually benefitted both parties, since they preserved the equipment in good working order, thereby enhancing the future salvage value plaintiff expected to gain. There is no question that it served the lots of the subdivision that Kraft was trying to sell as well as the lots previously served by the former Franklin pump

station. Thus, there was a mutual benefit to defendant's entry and maintenance of the pump station.

The trial court heard testimony that Kraft never applied for a license to operate the Glen Eden pump station and that after the pump station was operating, Kraft did nothing, prior to filing its lawsuit, to deny the county access to the premises. Kraft never changed the locks or constructed barriers at the pump station to interfere with defendants' operation and maintenance. There was implied consent or acquiescence by Kraft for the defendants' representatives to enter the premises and perform the functions contemplated from the beginning of the project. We, as did the trial court, find no unlawful entry or trespass upon the defendants' property in the peculiar circumstances of this case. The directed verdicts were properly granted.

Plaintiff-appellant's sole assignment of error is overruled.

### CROSS–APPEAL

For its cross-appeal, the county asserts three assignments of error, which we will address in the order presented.

"I. Whether the jury's verdict and the subsequent trial court's judgment were obtained contrary to the manifest weight of the evidence."

It will be helpful to summarize the claims of the parties as a background to the legal principles we must apply in resolving the cross-appeal.

The plaintiff's theory of its unjust enrichment (*quasi*-contract) claim was that the county compelled it to build an enhanced Glen Eden pump station to accommodate the lots formerly served by the thirty-year-old Franklin pump station, which had substantial overflow problems and which was to be demolished; that defendant delayed the construction of the facility and added to its cost by requiring expensive engineering changes and equipment modifications, which ballooned the cost of the facility from the estimated $380,000 to the completed cost of $686,594; that the county forced these changes on Kraft by threatening to withhold tap-in permits, which would have delayed the sale of Glen Eden lots to builders; that Kraft reluctantly accepted these changes because it thought it would recoup $200,000 to $250,000 when it realized on its salvage rights when gravity sewers were installed on Highland Road in 1994; that the county refused and delayed entering into a contract with Kraft, which resulted in mounting real estate taxes on Kraft; that the county refused to accept a transfer of the facility until the taxes were paid; that the county foreclosed on the facility, thereby compelling Kraft to pay the delinquent taxes to avoid loss of its investment.

Defendant county contended that it was not unjustly enriched by the construction of the Glen Eden pump station; that Franklin, although thirty years old, had

some overflow problems, but continued to be serviceable; that it was Kraft's engineers, CT Consultants, who suggested the demolition of Franklin and the enhancement of Glen Eden to accommodate the customers formerly serviced by Franklin; that the escalation of costs at Glen Eden from $380,000 to $686,594 was the result of underestimating and/or inflation, not attributable to any significant changes ordered by county engineers; that there was no assurance that the Highland Road gravity sewers would be constructed at any specific time, thereby allowing Kraft to realize on its salvage rights; and that it could not accept a transfer of the pump station until Kraft paid the delinquent real estate taxes.

At the threshold of legal analysis, we are compelled to consider certain legal issues that were never raised or argued in the trial court or on the parties' appeal to this court. *Sua sponte*, this court has raised the following issues after oral argument:

"1. As a matter of law, can the plaintiff maintain an action in *quasi* contract or unjust enrichment against the County; and

2. Did the County waive the legal defenses suggested by the first issue, by not raising it in the trial court or on appeal."

The parties were invited to address these issues and filed simultaneous briefs setting forth their respective positions.

It is a long-standing principle of Ohio law that "all governmental liability *ex contractu* must be express and must be entered into in the prescribed manner, and that a municipality or county is liable neither on an implied contract nor upon a *quantum meruit* by reason of benefits received." 20 Ohio Jurisprudence 3d (1980), Counties, Townships, and Municipal Corporations, Section 278, at 241. The seminal case in this area is *Buchanan Bridge Co. v. Campbell* (1899), 60 Ohio St. 406, 54 N.E. 372, wherein the Supreme Court of Ohio stated:

"Whatever the rule may be elsewhere, in this state the public policy, as indicated by our constitution, statutes and decided cases, is, that to bind the state, a county or city for supplies of any kind, the purchase must be substantially in conformity to the statute on that subject, and that contracts made in violation or disregard of such statutes are void, not merely voidable, and that courts will not lend their aid to enforce such a contract directly or indirectly, but will leave the parties where they have placed themselves. If the contract is executed, no action can be maintained to enforce it, and if executed on one side, no recovery can be had against the party of the other side." *Id.* at 419–420, 54 N.E. at 374.

The court stated this policy "is necessary to prevent abuses, and protect the public treasury from depletion by unscrupulous public officers." *Id.* The *Buchanan* court found that a bridge company's failure to supply bridge materials in substantial compliance with the statute addressing the purchase of such materials

was fatal to the validity of the contract and therefore void. *Id.* at 425, 54 N.E. at 375–376. Because the express contract was found to be void, no recovery could be had under an implied contract theory. The court continued that the statute is the authority and guide for both parties, and when parties disregard that authority, the court would leave the parties as it found them. *Id.* at 426, 54 N.E. at 376. These principles have prevailed down to modern times. See; also, *State ex rel. Athens Cty. Bd. of Commrs. v. Gallia, Jackson, Meigs, Vinton Joint Solid Waste Mgmt. Dist.* (May 9, 1995), Jackson App. No. 93CA730, unreported, at 5, 1995 WL 277164; *Knox Electrical Constr., Inc. v. Huron Cty. Landfill* (June 30, 1993), Huron App. No H–92–045, unreported, at 2, 1993 WL 235821; *F. Buddie Contracting, Inc. v. Lake Cty. Mental Retardation Bd.* (Dec. 30, 1983), Lake App. No. 9–154, unreported, at 3, 1983 WL 6047; *Asphalt Material & Constr. Co. v. Knox Cty.* (Feb. 23, 1982), Knox App. No. 81–CA–22, unreported, at 3, 1982 WL 2944. Therefore, those who deal with the county are charged with knowledge of the county's limitations in executing contracts.

In this case, however, there is no direct statute that deals with the method of contracting for a developer's construction of a pump station. It appears that R.C. Chapter 6112 governs the construction of a pump station by "any person." R.C. Chapter 6103 governs the county's responsibilities after construction is completed, and R.C. Chapter 6117 authorizes the establishment of county sewer districts. However, these statutes do not address the method of the county's entering into a contract for the construction of a pump station. In this regard, the instant case is somewhat different from those cases that follow *Buchanan Bridge.* Nonetheless, R.C. 305.25 governs the validity of county contracts and provides:

"No contract entered into by the board of county commissioners, or order made by it, shall be valid unless it has been assented to at a regular or special session of the board, and entered in the minutes of its proceedings by the county auditor or the clerk of the board."

No such contract was ever formally adopted by the county commissioners in the instant case.

It is problematic whether the outcome of the case below would have been different had the legal issue of whether the plaintiff could recover from the county in *quantum meruit* been timely raised in the trial court. However, the county did not raise the issue in its pleadings, nor did it make the argument at any time during the course of proceedings. We also note that the issue was not raised by assignment of error, briefing, or oral argument in this court on appeal. Given these circumstances, we are compelled to consider whether the county has waived any right to relief based on the legal defense prohibiting recovery under the *quasi*-contract doctrine.

We are loath to decide a case on a theory never advanced or relied on at the trial. As a reviewing court, it is not our duty to second-guess the strategy employed or the theory of the case advanced by the respective parties or their counsel. It is elementary that "the theory upon which a case is tried in the lower court must generally be adhered to on review." 4 Ohio Jurisprudence 3d (1978), Appellate Review, Section 138, at 300–301. Therefore, the doctrine of waiver is a salutary device to ensure fairness and finality at the trial level and should be enforced on appeal in the absence of some extraordinary reason to disregard it.

Because the public interest is at stake here and taxpayer funds will be used to satisfy any judgment against the county, an argument may be raised that the county cannot waive a legal defense that would have prevented the recovery. Recent cases in the sovereign immunity area plainly suggest that where the sovereign fails to plead or raise an affirmative defense, it will be deemed to have waived it even though the public treasury will have to foot the bill resulting from the waiver. See *Spence v. Liberty Twp. Trustees* (1996), 109 Ohio App.3d 357, 672 N.E.2d 213; *Mitchel v. Borton* (1990), 70 Ohio App.3d 141, 590 N.E.2d 832. See, also, *Jim's Steak House, Inc. v. Cleveland* (1998), 81 Ohio St.3d 18, 688 N.E.2d 506 (city's failure to raise *res judicata* as affirmative defense waived when not raised in pleadings or amendment to pleadings). There can be no question but that the no recovery in *quasi*-contract against the county was an affirmative defense that was waived by the county. See *State ex rel. Plain Dealer Publishing Co. v. Cleveland* (1996), 75 Ohio St.3d 31, 33, 661 N.E.2d 187, 189–190:

"An affirmative defense is a new matter which, assuming the complaint to be true, constitutes a defense to it. See *Davis v. Cincinnati, Inc.* (1991), 81 Ohio App.3d 116, 119, 610 N.E.2d 496, 498; Black's Law Dictionary (6 Ed.1990) 60. 'An affirmative defense is any defensive matter in the nature of a confession and avoidance. It admits that the plaintiff has a claim (the "confession") but asserts some legal reason why the plaintiff cannot have any recovery on that claim (the "avoidance").' (Footnote omitted.) 1 Klein, Browne & Murtaugh, Baldwin's Ohio Civil Practice (1988) 33, T 13.03."

To complete the analysis on this legal issue, we must confront the question of whether "plain error" requires us to entertain the rule against permitting *quasi*-contract recovery against the county. The Supreme Court has recently stated the very extraordinary circumstance that must obtain before "plain error" may be successfully invoked in a civil proceeding to overcome the result of a trial below. *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, paragraph one of the syllabus:

"In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself. (*Yungwirth v. McAvoy* [1972], 32 Ohio St.2d 285, 61 O.O.2d 504, 291 N.E.2d 739; *Schade v. Carnegie Body Co.* [1982], 70 Ohio St.2d 207, 209, 24 O.O.3d 316, 317, 436 N.E.2d 1001, 1003; and *Cleveland Elec. Illum. Co. v. Astorhurst Land Co.* [1985], 18 Ohio St.3d 268, 18 OBR 322, 480 N.E.2d 794, approved and followed.)"

The court further counseled that "[t]he plain error doctrine should never be applied to reverse a civil judgment simply because a reviewing court disagrees with the result obtained in the trial court, or to allow litigation of issues which could easily have been raised and determined in the initial trial." *Id.* at 122, 679 N.E.2d at 1104.

Having in mind the foregoing principles and admonitions, we are compelled to the conclusion that the county waived any legal defense it may have had to plaintiff's *quasi*-contract/unjust enrichment claim. Nor do we find that the invocation of the plain error doctrine relieves the county of its waiver because the waiver does not challenge the legitimacy of the underlying judicial process itself. The parties must be held to the outcome of the trial below on the issues they have joined and contended. An appellate court should not be the one to tip the scales in favor of one party or the other by injecting issues never raised.

Therefore, we will address our attention to the county's assignment of error that the unjust enrichment award was against the manifest weight of the evidence.

In determining whether a trial court's judgment is against the manifest weight of the evidence, we are guided by the principles stated in *Arnett v. Midwestern Ent., Inc.* (1994), 95 Ohio App.3d 429, 431, 642 N.E.2d 683, 684:

"We initially note that a judgment supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. See *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 262, 376 N.E.2d 578, 579. In addition, under a manifest weight of the evidence test, the court of appeals is guided by the presumption that the findings of the trial court are correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276."

We note that the evidence below was scrutinized and weighed by the trial court and a unanimous jury acting in an advisory capacity pursuant to Civ.R.

39(C). We also note that the advisory jury returned a verdict of $512,000 in favor of Kraft on its unjust enrichment claim with which the trial court substantially agreed in entering its own judgment. Given an independent and complete review of the record, we cannot find that the result below was against the manifest weight of the evidence.

This court set forth a synopsis of the law of unjust enrichment in *Donovan v. Omega World Travel, Inc.* (Oct. 5, 1995), Cuyahoga App. No. 68251, unreported, at 7–8, 1995 WL 588721:

"Generally speaking, a claim for unjust enrichment lies whenever a benefit is conferred by plaintiff upon a defendant with knowledge by the defendant of the benefit and retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183 [12 OBR 246, 249–250, 465 N.E.2d 1298, 1301–1302]; *Katz v. Banning* (1992), 84 Ohio App.3d 543, 552 [617 N.E.2d 729, 735–736]. Where a party misappropriates another's proprietary information and uses it to its own benefit, an agreement to pay may be implied and the aggrieved party can recover. *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 7 [540 N.E.2d 257, 263–264]. Civil liability may be imposed where one party retains a benefit from another's labors. *Shaw v. J. Pollock & Co.* (1992), 82 Ohio App.3d 656, 662 [612 N.E.2d 1295, 1299–1300], citing to *Rice v. Wheeling Dollar Savings & Trust* (1951), 155 Ohio St. 391 [44 O.O. 374, 99 N.E.2d 301]. This implied obligation (*i.e.,* quasi contract) is derived from the equitable principle 'based on the moral obligation to make restitution which rests upon a person who has received a benefit which, if retained by him, would result in inequity and injustice.' *Rice, supra* at 398 [44 O.O. at 377, 99 N.E.2d at 305]. In order to prevent such unjust enrichment the law implies a promise to pay a reasonable amount for services in the absence of a specific contract. *Thomas & Boles v. Burns* (March 31, 1994), Cuyahoga App. No. 64995, unreported, 1994 WL 110950.

"In a case such as this, there is no necessity for precise equivalence between the defendant's gain and the plaintiff's loss. See 1 Palmer *Law of Restitution* § 2.6 at 82 and *Federal Sugar Ref. Co. v. U.S. Sugar Eq. Bd.* (S.D.N.Y.1920), 268 F. 575. Recovery should be allowed for the value to plaintiff of the use of the property or benefit, even if a plaintiff suffered no out-of-pocket loss. See 1 Palmer at § 2.10 at 133–34. The greater of the value taken from plaintiff as compared to the 'benefit' to defendant should be the basis. *Developers Three v. Nationwide Ins. Co.* (1990), 64 Ohio App.3d 794, 800 [582 N.E.2d 1130, 1134], citing *Restatement of Law, Restitution* (1937), 595–596, Section 150. We find there was adequate evidence of value transferred to defendant through acquisition of the Essex account by reason of plaintiff's efforts."

The trial court's judgment entry filed February 6, 1997 set forth its synopsis of the key evidence as follows at 1–2:

"In October of 1988, negotiations began between the litigants for the construction of a sewage pumping station to service 130 of Plaintiff's newly developed lots recently purchased by Kraft Construction Company.

"Tentatively, the parties agreed that Kraft would construct the Glen Eden Station to serve the 130 Kraft lots, as well as replace the Franklin station. Kraft was to demolish the Franklin facility, construct the new Glen Eden facility, and transfer the property to Defendant County, but retain salvage rights to the property. Preliminary approval was given by the County to the plan, with a cost of construction to the Plaintiff, of $380,000.00

"During the period between March of 1989 and June of 1992, Thomas Ackerman of Kraft Construction made numerous requests to the county for a written contract reflecting the terms and conditions of the agreement. The county failed to submit a contract proposal until June of 1992. It was during this period that the costs of the project greatly escalated, and in January of 1992 the final cost of the project totaled $686,594.00.

"The contract submitted by the county was executed by the Plaintiff in June of 1992, and returned to the Defendant, with a change in the terms of the agreement relating to payment of taxes and assessments. In February of 1993 the county again submitted the original contract and deed, demanding that the documents be executed without any changes by the Plaintiff. The Plaintiff refused to execute the contract as presented by the county, and in August of 1993 the county threatened to suspend Kraft's sewer tie-in permits unless the agreement was accepted. (The County later learned that the project had been completed earlier and the county was without leverage to compel the Plaintiff to execute the agreement.)

"The Plaintiff failed to pay the assessed taxes and the Defendant County instituted foreclosure proceedings against the property for failure to satisfy real estate taxes. The taxes have since been paid in full by the Plaintiff."

In applying the law of unjust enrichment to the facts, the trial court found that "the above facts in evidence support a finding that Defendant wrongfully received and benefitted from its dealings with Kraft and that justice dictates that it not be permitted to enrich itself unjustly thereby." The trial court then went on to find that the amount of unjust enrichment was the difference between the actual cost of the pumping station ($686,594) and the cost of the pumping station ($380,000) "had the county not leveraged influence to compel changes." The county was found to have "wrongfully benefitted in the amount of $306,594."

"The Court further finds that it was within the contemplation of the parties that the subject real estate was to be transferred by Plaintiff Kraft to Defendant [Regional Sewer District] with Kraft maintaining salvage rights to the pumping station. Further, the Court finds that the County has been unjustly enriched based upon its failure to submit a contract and warranty deed until June of 1992, and that the Plaintiff has paid real estate taxes on the subject parcel to date without enjoying the use of the property." (Judgment Entry at 4.)

Kraft's theory of unjust enrichment was premised on the argument that the county economically forced Kraft to build a larger and more expensive pumping station than Kraft's own needs required and that the county did this by requiring expensive changes, refusing to enter into necessary contracts and threatening to deny tap-ins to the Kraft lots served by the system unless Kraft succumbed to its wishes.

The county acknowledges on appeal that "the only unresolved question is whether the county applied pressure to force Kraft to include the demolition of the Franklin pump station and the enlargement of the Glen Eden pump station in its plan in order to accommodate the added residences serviced by Franklin." Cross–Appellant's Brief at 6. Although the county argues that "there is not one scintilla of credible evidence to that effect," we are compelled to conclude otherwise.

There is no question that in the bargain the county has received the benefit of a new state-of-the-art pump station that now serves some three hundred twenty lots previously served by the thirty-year-old Franklin pump station that had serious overflow problems. Although there was conflicting evidence to be resolved by the trier of fact, there was sufficient evidence in the record to support Kraft's theory of the case and the court's findings quoted above.

Discussions about the legal interest of all parties involved regarding the Glen Eden pump station began in 1988 and continued through the year 1996.

At trial, plaintiff's witness, John David Wiles, P.E., Glen Eden project manager for CT Consultants, testified at length to the original and continuing negotiations with the county engineers about the size, design, and changes to the Glen Eden pump station. He testified that in the design stages, the county wanted to correct the overflow (infiltration/inflow) problems at the Franklin pump station that caused problems with the EPA and NEORSD; that this called for the demolition of Franklin and enlargement of Glen Eden capacity; that of the four alternative plans for Glen Eden, the county requested the most expensive in order to serve the Franklin lots; that Wiles's choice was the less expensive facility to serve the new Glen Eden property owners and would have cost $170,000, not $380,000; that the original plans approved by the county provided for an initial cost of $380,000, but that the county requested changes and

upgrades that increased construction costs substantially and were added to serve the Franklin lots; that some changes included going from constant speed to variable speed drives ($50,000), increasing the size of the holding tank from 13,000/26,000 gallons to 90,000 gallons, adopting aluminum hand railings rather than steel, and increasing generator standby power; and that these changes added $96,000 in engineering costs. In Wiles's experience, "any oversizing or increased construction costs necessary to provide service to areas outside the new development, you would determine what the incremental increased cost is and then the county would contribute towards that." Wiles prorated the county's share of serving Franklin lots as $540,000.

Kraft's owner Thomas Ackerman corroborated some of Wiles's technical and cost testimony. He testified to the overflow problems at Franklin and that Kraft built the state-of-the-art Glen Eden facility for temporary use, since Highland Road sewers would be built in 1994. He originally agreed to pay $380,000 for a pump station worth only $170,000, recognizing that he would get salvage rights worth $200,000 when Highland Road sewers went in. Costs went up with county changes, which he estimated at $150,000. He consented to changes to keep the project moving and avoid financial ruin.

Although there was conflicting testimony on some of these items from county witnesses, Hunsinger and Schneiderman, disputing the accuracy of plaintiff's testimony, on appeal the county does not specifically claim that the damages were excessive or unsupported by the record.

Although the pump station was completed and used by the county starting in January 1991, the first draft Glen Eden pump station agreement, dated July 15, 1992 and written by Hunsinger for the county, gave reversionary rights to the adjoining land owner and salvage rights to Kraft "upon installation of a future trunk sanitary sewer and subsequent abandonment of the pump station * * *." A certificate of completion and acceptance, also drafted by Hunsinger for Kraft's execution, was included. Kraft's officers executed the agreement and certificate, returning them to the county. However, the agreement and certificate were never accepted by the county, although they had been drafted by the county.

Ackerman deleted on the first warranty deed the words "which the grantor herein assumes and agrees to pay" contained within the warranty provisions, signifying Kraft's intention not to be stuck with the real estate taxes and assessments. The county, however, refused to accept the deletion and sent letters to Kraft regarding the same.

The county controlled the issuance of sewer tap-in permits that gave permission for a home's sewer line to connect to the county's sewer system. Without the issuance of such a permit, a home cannot be built, nor will an occupancy permit be issued. In turn, as the county witnesses conceded, since a developer

has a tremendous financial interest in the development, a large financial loss would occur without such permits being issued.

However, an interoffice memorandum dated September 5, 1990, written by William Collins to John Campbell, both employees of the county, indicated that the county had already "shut down" the subdivisions of plaintiff. A letter dated August 12, 1993 from Hunsinger to Kraft also indicated that the county would suspend issuance of sewer permits if the aforementioned draft agreements were not signed immediately unchanged and unaltered.

In fact, an internal memorandum from Hunsinger to his boss, Jim Bruggeman, in late 1993 indicated that "because the sewer permits were issued by the county and you didn't know it, you do not have any leverage to force the developer * * * to complete the documents which would lead to the official take-over" of the Glen Eden pump station. Hunsinger found out almost three weeks later after writing the letter to Kraft with the threat of suspending the issuance of sewer tap-in permits that that had already been done. The interoffice memo included the handwritten note by Hunsinger that "we are out of luck on this," signifying that the county had lost its leverage.

According to the adjoining landowner, Jack Thomas, and Kraft's principal, Thomas Ackerman, Hunsinger indicated that new gravity sewers would be in place to eliminate the Glen Eden pump station in the year 1994. Hunsinger did not, in writing or otherwise, discuss with Kraft the issue of real estate taxes due prior to or after the signing by Kraft of the July 15, 1992 draft agreement. In 1994, Kraft began to receive delinquent real estate tax notices from the county regarding the pump station lot. On August 23, 1995, the county filed a foreclosure action against Kraft for nonpayment of the real estate taxes. Kraft ultimately paid all the delinquent real estate taxes on the real property or lose its salvage rights.

Based on this and other evidence in the record, we cannot find that the trial court's finding of unjust enrichment was against the manifest weight of the evidence.

Cross–Assignment of Error No. I is overruled.

"II. Whether the trial court committed reversible error by admitting numerous hearsay documents and allowing inadmissible testimony thereon."

On this assignment of error, the county contends that Hunsinger was cross-examined on documents obtained from his file and that "most of these letter exhibits were admitted over opposing counsel's objection and were used both by the jury and trial court in arriving at a decision in favor of Kraft."

A review of the transcript, however, indicates that there was no objection by the county on transcript pages 159, 162, 215 and 222. Most of the documents

noted were admitted without objection by the county at the close of Kraft's case-in-chief. Specifically, PX. 4, 7, 10, 11, 12, 12A, 13–18, 21, 23–28, 35–38 and 41–43 were admitted by the county without objection. Evid.R. 103(A) states: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected, *and* (1) * * * [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record stating the specific ground of objection * * *." Intervening numbered exhibits were not used or offered. (*E.g.*, PX. 5, 8–9, 19–20, 29 and 33.)

The county objected only to PX. 2 and 3, but subsequently indicated that there was nothing prejudicial about them. Thereafter the county objected only to PX. 6, 22, 30–31, which were documents that were prepared by county engineers who worked for Hunsinger. These exhibits came from Hunsinger's file.

■ The bulk of these documents were part of the business records kept in the usual and ordinary course of the county's business and came within the hearsay exception of Evid.R. 803(6). A review of the record clearly indicates that Richard Hunsinger testified that he personally photocopied these papers from his file for Kraft's counsel in response to a request for production of documents. Many of the same documents were not hearsay because they contained admissions by a party opponent through its agents. Evid.R. 801(D)(2).

■ Even assuming, *arguendo,* that the county had raised proper hearsay objections, there is no merit to its assignment of error. A review of the record reveals that the county's rights were not substantially prejudiced, and Kraft presented sufficient admissible evidence to prove the essentials of its claims.

The county's Cross–Assignment of Error No. II is overruled.

"III. Whether the trial court improperly instructed the jury in its charge."

This cross-assignment of error alleges that the trial court improperly instructed the jury in its charge. The county fails to specify in what respects the charge was erroneous. The transcript shows no objection whatsoever to the charge by the county except for the special interrogatories that the trial court submitted. We find this cross-assignment to be without merit.

This was a bench trial with an advisory jury pursuant to Civ.R. 39(C). Whether the jury instructions had any bearing on the outcome of the case is problematical. The court, after receiving the "advisory verdict" from the jury, made its own determination, prepared a judgment entry with its own findings of fact and conclusions of law, and reduced the damage award.

In any event, "[o]n appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of

the objection." Civ.R. 51(A). The record discloses that the county had an opportunity to object to the jury instructions but failed to do so. Thus, any error is reversible only if it amounts to plain error.

Plain error need not be objected to or affirmatively waived, but must be obvious and prejudicial to such an extent that it has "a material adverse effect on the character and public confidence in the judicial proceedings." *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 209, 24 O.O.3d 316, 317, 436 N.E.2d 1001, 1003. The plain error doctrine is utilized in civil matters only under exceptional circumstances to prevent a manifest miscarriage of justice. *Cleveland Elec. Illum. Co. v. Astorhurst Land Co.* (1985), 18 Ohio St.3d 268, 275, 18 OBR 322, 327–328, 480 N.E.2d 794, 800–801. There is no plain error present. We find no manifest miscarriage of justice in the proceedings below.

Cross–Assignment of Error No. III is overruled.

*Judgment affirmed*
*and cross-appeal denied.*

TIMOTHY E. McMONAGLE, J., concurs.

ROCCO, J., dissents.

KENNETH A. ROCCO, Judge, dissenting.

I concur with the majority on appellant/cross-appellee's sole assignment of error relating to the trial court's directed verdict on the issues of trespass and conversion. I concur as well in the majority's findings regarding appellee/cross-appellant's second and third assignments of error relating to the trial court's decisions on hearsay testimony and jury instructions. However, I respectfully dissent from the majority's finding on appellee/cross-appellant's first assignment of error. I would reverse the trial court's finding of unjust enrichment as being against the manifest weight of the evidence.

To hold otherwise is to insulate Kraft from its own bad business decision, a decision it made at arm's length. The majority's decision casts Cuyahoga County in the role of guarantor of Kraft's profits on the residential development in question. There is some irony in providing a real estate developer with a significant advantage in an arm's-length transaction with a county agency. Most would assume that an experienced real estate developer would have the greater business acumen, not the typical bureaucrat on the other side of the bargaining table.

A party is not entitled to compensation on the grounds of unjust enrichment, in the absence of fraud or bad faith, if he received from the other party that which it

was agreed between them the other should give in return. Kraft did receive the benefits from the county that it was agreed between them should result from the construction of the pump station: permission to proceed with its residential development, salvage rights to the pump station equipment, and the inclusion of a reversionary clause in the transfer of title agreement. Kraft thus received the benefit of its bargain. There was no evidence showing fraud or bad faith on the county's part. In addition, the only "benefit" that the county received was a new sewage pump station to help alleviate the burden of the additional sewage that Kraft's development, itself, would generate. There should be no recovery under a theory of unjust enrichment.

The jury's verdict and the court's judgment were obtained contrary to the manifest weight of the evidence. The trial court had found that the evidence showed that the county wrongly received benefits from its dealings with appellant/cross-appellee Kraft.

Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus; *Slone v. Aerospace Design & Fabrication, Inc.* (1996), 111 Ohio App.3d 725, 735, 676 N.E.2d 1263, 1269–1270. However, my review of the record in this case leads me to the conclusion that Kraft did not produce credible evidence going to all the essential elements of its action for unjust enrichment.

An action for unjust enrichment, or *quantum meruit*, is for the value of services rendered. *Natl. City Bank v. Fleming* (1981), 2 Ohio App.3d 50, 57, 2 OBR 57, 63–64, 440 N.E.2d 590, 598–599. Such an action rests upon the equitable principle that one shall not be permitted to unjustly enrich oneself at the expense of another without making compensation therefor. *Id.* In order to demonstrate a prima facie case, a plaintiff must show that he conferred a benefit upon another and that the circumstances render it unjust and inequitable to permit the other to retain the benefit without making payment. *Id.*

In the absence of fraud or bad faith, however, one is not entitled to compensation on the grounds of unjust enrichment if he received from the other party that which it was agreed between them the other should give in return. *Ullmann v. May* (1947), 147 Ohio St. 468, 34 O.O. 384, 72 N.E.2d 63, syllabus. See, also, *S & M Constructors, Inc. v. Columbus* (1982), 70 Ohio St.2d 69, 71, 24 O.O.3d 145, 146, 434 N.E.2d 1349, 1351–1352; *Eyerman v. Mary Kay Cosmetics, Inc.* (C.A.6, 1992), 967 F.2d 213, 222. This is precisely what happened here: The evidence at trial showed that Kraft did receive in fact the benefits from the county that it was agreed between them should result from the construction of the pump station.

Because there was no evidentiary showing of fraud or bad faith and Kraft did receive the agreed-upon benefits, there should be no recovery under a theory of unjust enrichment. *Ullmann, supra.* Kraft did not produce "competent, credible evidence going all to all the essential elements" of its claim of unjust enrichment, and hence the judgment was against the manifest weight of the evidence. *C.E. Morris Co., supra.*

Kraft alleged that the county wrongfully enjoyed benefits from the pump station from July 1992 until the filing of the suit in 1996. Kraft's theory of the case, as reflected in its amended complaint, was that it was entitled to recover, under a theory of unjust enrichment, the reasonable value of the usage and resulting depreciation of the pump station, "as defendant used such without the expectation of paying a reasonable value therefor." In fact, there was no testimony or any other evidence establishing any understanding between Kraft and the county that there would be money payment for the pump station. The evidence did not establish that Kraft had any expectation of a money exchange.

Kraft's construction of the pump station was, in effect, in exchange for permission to develop new residential subdivisions. This permission was, in fact, granted. The ability to develop a residential subdivision in Highland Heights in exchange for a pump station is arguably an exchange of "reasonable value," and testimony at trial established that it was a standard exchange in a development situation. Kraft thus received from the county that which it was agreed between the parties it would receive.

It must be recalled, as well, that the "benefit" of the pump station to the county is primarily that of reducing the burden of the additional sewage that Kraft's development, itself, will generate. Kraft seeks to be insulated from what was essentially its own bad business decision: Kraft had the option of holding off on its development plans until the new municipal gravity sewers were actually approved, if Kraft believed this would occur, and so avoid the cost of constructing the complex pump station that would otherwise be required. Instead, Kraft chose not to wait but to proceed with the residential development and the resultant construction of the Glen Eden pump station.

A claimant alleging unjust enrichment must also demonstrate the reasonable value of the benefit conferred. *National City Bank, supra,* 2 Ohio App.3d at 57, 2 OBR at 63–64, 440 N.E.2d at 598–599. The court did not award relief based on the reasonable value of the usage of the pump station and resulting depreciation, as Kraft had asked. The trial court's judgment reduced the jury's advisory award from $512,000 to $306,594, which the court stated was the difference between the original anticipated cost of the pump station and the actual cost of the pump station. The court made no finding as to the reasonable value of the usage and resulting depreciation of the pump station.

The relief awarded by the trial court, instead, implicitly held the county responsible for *all* increases in the cost of construction as well as *any* possible inaccuracies in the initial estimate prepared by CT Consultants, the engineering consultant hired by Kraft. The evidence in the record was inadequate, in my opinion, for a factfinder to place the entire burden for the difference between an initial estimate for construction costs and the final cost on one party.

Appellant/cross-appellee Kraft Construction Company hired CT Consultants, and it was CT Consultants that eventually prepared the proposal, in March 1988, that Kraft construct a new (Glen Eden) pumping station to replace the existing pumping station, the Franklin pump station, and serve not only the new subdivisions to be developed by Kraft but other existing residential areas as well. The cost of the pump station initially was estimated by CT to be $380,000, but when finally completed, with modifications required by the county, the actual cost was $686,594.

For reasons that were in dispute, the necessary agreements to transfer title of the pump station to the county were delayed during the period March 1989 through June 1992. The station has been operating since approximately December 1990 or January 1991. The county sanitary engineer responsible for this matter, Hunsinger, testified that the paperwork was "delayed" because Kraft was in "a big hurry" to begin the construction of the station so as not to delay the rest of the development and understood that the paperwork would have to follow, rather than being completed prior to construction, as is normal. Kraft argued that the county required it to build a state-of-the-art pump station, while knowing that it would be retired from service two or three years later.

As it turned out, the complexity of the pump station and operational adjustments that the county determined were required led to an increase in the cost of construction. As the majority correctly points out, "when the pump station first went on line there were many engineering problems which had to be corrected by the project engineer." The county's position, understandably, is that it wanted to make sure that the station was operating properly before it took title. If the pump station was not operating correctly as constructed by Kraft, as the majority admits, it is difficult to understand how the entire burden for the added cost and delay should be placed on the county. The evidence in the record establishes that any cost overruns incurred were at least as much the responsibility of Kraft as of the county.

In negotiations for an agreement concerning the construction and transfer of title for the pump station, Kraft was allowed to retain salvage rights for the pump station equipment, which was assigned a fair market value of $200,000, upon eventual abandonment by the county. Kraft also negotiated a reversionary clause in which the pump station property would revert to the owner of a

neighboring parcel when the county abandoned the station. The county accepted both of Kraft's proposals, which were incorporated into the agreement. The "reasonable value" received by Kraft in exchange for the pump station would have included not only the ability to develop the residential subdivision in Highland Heights but the salvage rights and the reversionary clause as well.

Kraft maintained at trial that it was told that the pump station would be abandoned in two years as a result of a new municipal sewer system. The county denied this, since it had no control over the timing of the construction of additional municipal sewers. The proposed written agreement between the parties stated nothing about a time frame for abandonment of the pump station, nor did Kraft attempt to modify the agreement to include such a date..

In July 1992, Kraft did sign and return a modified agreement and warranty deed to the county but simply deleted a portion that required it to pay outstanding real estate property taxes on the parcel. When the county refused to accept the transfer of title until Kraft paid the outstanding property taxes on the pump station property, Kraft filed suit against the county.

I would find that appellee/cross-appellant's first assignment of error has merit. Since Kraft received the benefits from the county that it was agreed between them should result from the construction of the pump station, there should be no recovery under a theory of unjust enrichment. The trial court's judgment was against the manifest weight of the evidence. As this case was tried to the court, with the jury rendering merely an advisory verdict, and the sole assignment of error to be sustained is that the judgment was against the manifest weight of the evidence, the judgment and award as to unjust enrichment should be reversed under App.R. 12(C).