**LaCONTE ENTERPRISES, d.b.a. Airport Greens Golf Course, Appellee,**

v.

**CUYAHOGA COUNTY, Appellant.**

[Cite as *LaConte Ent. v. Cuyahoga Cty.* (2001), 145 Ohio App.3d 806.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 78357.

Decided Sept. 10, 2001.

*Schmelzer Caterino & Tamkin, Thomas Schmelzer* and *Eli Tamkin,* for appellee.

*William D. Mason,* Cuyahoga County Prosecuting Attorney, and *Saundra Curtis–Patrick,* Assistant Prosecuting Attorney, for appellant.

---

ANNE L. KILBANE, Judge.

This is an appeal from an order of Judge Janet Burnside in a declaratory judgment action that found appellant Cuyahoga County ("county") in breach of its lease agreement with appellee LaConte Enterprises, d.b.a. Airport Greens Golf Course ("LaConte"), and that required it to reimburse LaConte for admission taxes it paid to Willoughby Hills and Highland Heights. The county claims that its lease does not mandate and it has no authority to pay or reimburse, such taxes. We affirm.

In 1987, the county, pursuant to R.C. 307.02, received bids for the construction and lease of a golf course on property it owned contiguous to the Cuyahoga County Airport. The proposed lease and bid specifications were developed by the county in close conjunction with Richard LaConte, a golf course designer, builder, and operator. The bid of LaConte's Frenchmen's Landings North, Inc. was accepted, and the parties entered into an agreement under which that entity would construct and operate a golf course on the property for twenty years with an option for an additional twenty-year period, after which the property and all improvements would revert to the county. Article 6(C) of the lease stated the following, in part:

"The premises under this Lease are owned by the COUNTY, have been removed from the tax rolls and are not subject to real estate or amusement taxation. However, it is contemplated that LESSEE shall be subject to Ad Valorem taxation upon all personal property owned by LESSEE and used on or in connection with the leased Premises. LESSEE covenants to pay such taxes as may be lawfully assessed against such personal property."

The lease provided for unspecified [1] obligations to maintain the golf course and make capital improvements to it during the term of the lease. Rent was based upon a graduated percentage of golf-related fees and charges with yearly minimums and a percentage of the food and refreshment sales.

A subsequent assignment and consent transferred Frenchmen's Landings' interest in the lease to LaConte Enterprises and the lease was later amended to specify, *inter alia,* that the initial twenty-year lease term would run from July 1, 1988 through June 30, 2008, with an option period to end on June 30, 2028. LaConte spent approximately $2 million building Airport Greens Golf Course.

In 1991, the cities of Willoughby Hills and Highland Heights, in which the golf course was located, notified LaConte that it was liable for admission taxes imposed upon the users of golf courses in those cities. Patrick J. Murphy of the county prosecutor's office responded by letter to Willoughby Hills, on LaConte's behalf, stating it was the county's position that the golf course should not be subject to admission taxes because it was publicly owned and, because a Metro-Parks golf course located in the same city was apparently exempt from such taxes, Airport Greens should also be exempt.

In 1994, LaConte submitted a proposed lease amendment to the county to extend the original lease term to forty years and to compromise the payment of rent during the period before the golf course was fully operational, and stated its position that Article 6(C) required the county to defend it and hold it harmless for the payment of any admission taxes imposed by Willoughby Hills or Highland Heights. Although witnesses for both parties testified that they believed that the lease had been extended, the record does not indicate that the amendment was ever executed, and there is no record of a written response concerning any of the issues raised in the letter. Murphy testified that he told LaConte that the county would not pay the municipal admission taxes or undertake LaConte's defense should the cities attempt to collect it.

LaConte entered into a settlement agreement with the two cities, agreeing to pay a five percent combined tax beginning January 1, 1998, in exchange for a waiver of the cities' claims to back taxes and penalties. Although the county was not a party to this agreement and did not participate in its negotiation, LaConte notified it of the negotiations and the settlement reached. When LaConte began paying the admission taxes to the municipalities in 1998, it withheld rent payments to the county.

On February 23, 1999, LaConte filed a complaint for declaratory judgment, alleging that the lease obligated the county to indemnify it for the admission

---

1. Only part of the lease agreement is included in the record.

taxes paid, and requesting that the county be prohibited from invoking the forfeiture provisions of the lease in response to the withholding of rent. During the bench trial, Richard LaConte testified that, while working with the county to develop the bid specifications, he requested the tax exemption clause in the lease specifically because Frenchmen's Landings did not want to be subject to municipal admission taxes. He stated that a five percent increase in fees at Airport Greens would harm its ability to compete with neighboring courses, so he did not raise the existing fees but paid the taxes, which essentially lowered the income generated by the golf course. The evidence also showed that the county began paying real estate taxes on that portion of the course property located in Lake County because the land was no longer exempt by virtue of its use for a private, for-profit enterprise.

Murphy reviewed the lease document negotiated between Frenchmen's Landings and the county's Robert Shea prior to the county's approval of the lease. Although he did not recall finding Article 6(C) significant at the time, he testified that it was the county's position that the clause referred only to the period when the lease was executed because no golf course existed and, therefore, no admission taxes applied to the undeveloped property. He stated that he believed that the golf course would not be subject to municipal admission tax ordinances because the land was owned by the county and the admission tax clause was never intended to be a promise that those municipalities would never impose such taxes, or that the county would defend or reimburse the operator for any such taxes imposed.

Despite a stipulation that the two cities passed admission tax ordinances after the lease was executed, the evidence revealed otherwise. After requesting and receiving post-trial briefs on mistake issues, the judge ruled in LaConte's favor, finding that the county's representation that the premises had been "removed from the tax rolls" and the express request and reliance upon that representation constituted a county promise that the golf course would enjoy a tax-free status, thereby imposing an obligation upon the county to reimburse LaConte for the municipal admission taxes. The judge granted the limited relief requested by LaConte: that the county was in breach of its lease and obligated to reimburse LaConte for taxes already paid, but did not enter an order concerning future tax payments.

The county's first assignment of error states:

"I. The trial court erred by its determination that the county breached the lease agreement, and was liable for indemnification to its lessee in the amount of admission taxes paid."

The interpretation of the terms in a written contract is a question of law that we review *de novo*.[2] However, where the interpretation of terms depends on evidence of the parties' intent presented at trial, we review the factual determinations for abuse of discretion.[3] There was evidence that Frenchmen's Landings sought, and the county understood, Article 6(C) to specifically ensure that the golf course would not be liable for any municipal admission tax. The county's alternate explanation, that the clause simply verified that the undeveloped property was at that point not subject to admission taxes,[4] renders the inclusion of the clause meaningless. Because the lease intended the development and private, for-profit operation of a golf course, a known target for such tax, it would make no sense to state that undeveloped property is not subject to admission taxes—instead, it is logical to conclude that the clause related to the golf course enterprise.

It is difficult to believe that parties to a golf course development lease would include a representation specifically directed toward municipal admission taxes yet agree to limit that representation to apply only to the time period before the golf course was operational. Moreover, when Lake County demanded real estate taxes on that portion of the golf course within its boundaries, the county paid without requesting any reimbursement from LaConte—an indication of its responsibility to relieve LaConte of the taxes listed in Article 6(C).

Section 201(2) of the Restatement of the Law 2d, Contracts (1979), provides:

"Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made

"(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or

"(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party."

As noted, LaConte had no reason to know that the county would interpret the admission tax provision to be limited to an undeveloped piece of land, when the contract contemplated the construction and operation of a golf course. By contrast, the county knew or should have known that Frenchmen's Landings included the admission tax provision specifically to obtain relief from such taxes.

---

**2.** *Long Beach Assn. v. Jones* (1998), 82 Ohio St.3d 574, 576, 697 N.E.2d 208, 209.

**3.** *United States Fid. & Guar. Co. v. Stahl* (Apr. 29, 1993), Cuyahoga App. No. 62186, unreported, 1993 WL 135836.

**4.** The county did not dispute that the term "amusement tax" was intended to refer to admission taxes.

On the facts presented, the judge correctly determined that the parties intended Article 6(C) to relieve LaConte of any duty to pay municipal admission taxes.

Despite its inability to provide another reasonable interpretation of Article 6(C), the county contends that, without an express indemnity clause, it cannot pay LaConte's admission taxes and, moreover, that it cannot be required, on an estoppel theory, to satisfy an obligation it mistakenly undertook. Both of these arguments attempt to create an issue where none exists.

■ Although the county has proffered no reasonable alternate interpretation of the contract's language, it argues, citing *Kraft Constr. Co. v. Cuyahoga Cty. Bd. of Commrs*,[5] that it cannot be held liable to indemnify or reimburse LaConte absent an express contractual provision; however, this is not a *Kraft*-type case in which we are asked to imply a contract where none exists. The county made Frenchmen's Landings a promise under the belief that the cities would not or could not impose the tax, and that promise remained viable after the cities enforced collection. At that point the issue is no longer whether the county promised LaConte freedom from the tax liability but how that promise is to be effected.

■ The county's indemnity argument raises a question of remedy, not whether it breached its agreement. The judge did not imply an indemnity clause into the contract but simply found that the county was liable for breach of contract. A contract promise is not rendered unenforceable because the parties fail to include a term specifying the remedy for its breach. Where the contract provides a basis for determining a remedy, the law will provide it.[6]

Because the evidence suggested that the parties might have mistakenly believed that neither Willoughby Hills nor Highland Heights had an admission tax ordinance in place at the time the lease was executed, or that the parties mistakenly believed that the cities could not lawfully impose admission taxes where the golf course was located on county property, the judge requested briefing on mistake issues. In her judgment entry, however, the judge did not find that either party entered the contract under a mistaken belief but, instead, that the county agreed to hold LaConte harmless from tax liability regardless of the circumstances. We agree that the county bore the risk of its promise in any event.

Sections 152 and 153 of the Restatement of the Law 2d, Contracts (1979), state that a party's material mistake may render a contract voidable under certain

---

5. (1998), 128 Ohio App.3d 33, 44, 713 N.E.2d 1075, 1082.

6. Restatement of the Law 2d, Contracts (1979) 5, Section 1; *Mr. Mark Corp. v. Rush, Inc.* (1983), 11 Ohio App.3d 167, 169, 11 OBR 259, 464 N.E.2d 586, 589–590.

circumstances, unless the party bears the risk of the mistake pursuant to Section 154, which states:

"A party bears the risk of a mistake when

"(a) the risk is allocated to him by agreement of the parties, or

"(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

"(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so."

The preponderance of the evidence does not show that any mistake was made, or that the county's beliefs on the imposition or validity of municipal taxation had a material effect on its decision to hold LaConte harmless from such taxes. However, even if the judge found that the county agreed to the provision based on a material mistake, the county reasonably bore the risk of the mistake.

Frenchmen's Landings specifically requested the provision because it wanted exemption from municipal admission taxes, and the county included it in the lease knowing that the lessee would construe the provision as granting the exemption regardless of whether the cities sought to collect the taxes. By including the provision under these circumstances, the county accepted the burden of determining whether the cities had admission tax ordinances in effect, as well as the risk that the cities would subsequently enact such ordinances to levy against the Airport Greens Golf Course. Frenchmen's Landings had no reason to investigate the state of municipal admission taxes as long as it had the county's promise. Therefore, the county bore the risk of any mistake concerning the existence or enforceability of the admission taxes.

The dissenting opinion agrees that the admissions tax clause should not be divested of meaning, and concedes at least that it shows a mutual belief that no admissions tax would apply to the golf course, and that this was "a basic assumption on which the contract was based." In its subsequent analysis of risk allocation, however, the dissenting opinion completely ignores the evidence at trial and the judge's factual finding that Richard LaConte notified the county of his intentions, and it was aware of his interpretation of the clause prior to the parties' entering the agreement. Unless the dissent is prepared to find that the evidence does not support this finding and that the judge abused her discretion, there is no basis for allocating the risk to LaConte.

■ The county's estoppel argument also fails because the judge's ruling does not employ principles of estoppel but instead finds that the county made and breached an enforceable contract promise. The county claims that it had no

authority to make such a promise and, therefore, cannot be obligated to honor it. It fails to cite the source of the claimed prohibition and, instead, claims that LaConte must show the source of the county's power to agree to the tax provision. We find that the county's general power to contract sufficient. The provision intends to hold LaConte harmless only from payment of real estate and admission taxes—it does not require nonpayment of those taxes, nor does it require the county to pay the taxes directly. The lease does nothing more than provide a setoff of the municipal admission tax liability when calculating LaConte's rent. We know of no prohibition to such an agreement, the county has pointed to none, and we find no reason to believe that the county is not authorized to enter it. The first assignment of error is overruled.

The second assignment states:

"II. The trial court erred by failing to determine whether Ohio law allows a political subdivision to indemnify a non-governmental entity for payment of admission taxes."

The county's argument under this assignment is similar to that made in its estoppel argument above, namely that it cannot be held liable for the admission taxes because it had no authority to agree to the lease provision. We disagree for the reasons already cited—the county has the authority to contract, and nothing prevented it from entering a lease contract that contemplates an offset of taxes, whether achieved through rent reduction, reimbursement, or some other arrangement. Moreover, as above, the county does not cite any law supporting its lack of authority to enter this contract but seems to believe that LaConte is required to cite some specific statute allowing the lease provision here. We see nothing extraordinary in the clause at issue and will not find it excepted from the county's general authority to contract absent an indication that it is outside that general authority. The second assignment of error is overruled.

*Judgment affirmed.*

FRANK D. CELEBREZZE, JR., J., concurs.

KENNETH A. ROCCO, P.J., dissents.

KENNETH A. ROCCO, Judge, dissenting.

I would hold that the parties' lease agreement is not ambiguous, and that it does not include a promise by the county that local governments will never collect admissions taxes from the lessee, LaConte. At best, the clause at issue reflects a mutual mistake concerning the power of Willoughby Hills and Highland Heights to collect admissions taxes from activities on county-owned property. This

mistake might make the contract voidable, but it does not require the county to reimburse the lessee. Therefore, I would reverse the trial court's ruling here.

In construing the parties' contract, we must examine the language they used first. If the terms of the contract are clear and unambiguous, we must construe those terms as a matter of law. Only if we determine that the contract language is ambiguous can we venture beyond the terms of the agreement to examine the parties' intent through other evidence. "[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 374 N.E.2d 146.

I do not find the language of the contract ambiguous. In a section of the lease agreement relating to the calculation of rent, the lease provides:

"The premises under this Lease are owned by the COUNTY, have been removed from the tax rolls and are not subject to real estate or amusement taxation. However, it is contemplated that LESSEE shall be subject to Ad Valorem taxation upon all personal property owned by LESSEE and used on or in connection with the leased Premises. LESSEE covenants to pay such taxes as may be lawfully assessed against such personal property."

If the parties had intended to require the county to pay admissions taxes, they certainly knew how to do it. LaConte's specific promise, in the third sentence, to pay *ad valorem* taxes makes it difficult to imply a promise by the county to pay admissions taxes in the first sentence. Furthermore, if the parties had intended that the county would indemnify LaConte for any admissions taxes LaConte was required to pay, they also knew how to do that. There is an express indemnification clause elsewhere in the agreement requiring LaConte to indemnify the county from liability for injuries or property damage that occurs on the premises. There is no similar indemnification clause requiring the county to indemnify LaConte for admissions taxes.

The majority suggests that a construction that does not include a promise to pay renders the contract term "meaningless." I disagree. Not every term in a contract must be a promise or a warranty to have meaning. I read this term as an expression of the parties' understanding of the state of the law at the time the contract was made, a basic assumption upon which the contract was based. Unfortunately, the parties were wrong. The question now is, who bears the burden of that error. I do not agree with the majority's conclusion that the county agreed to bear it.

In my view, the majority has contorted the mistake analysis in order to create a self-fulfilling prophesy. The majority assumes that the county is the party

adversely affected by the parties' mistake because it contractually agreed to pay admissions taxes. This assumption demands a circular analysis: that the county cannot avoid the contract on the ground of mistake because it agreed to bear the risk that admissions taxes would be assessed.

The proper approach would recognize that LaConte is the party adversely affected by the mistake because it is required by law to collect admissions taxes from its customers and remit them to the cities. LaConte therefore can avoid the contract unless it bears the risk of the mistake.[7]

LaConte did not expressly agree to pay admissions taxes in the contract, so we cannot say that the contract allocated that risk to it. The issue then becomes: should the risk continue to be allocated to LaConte because:

"(b) [LaConte was] aware, at the time the contract [was] made, that [it had] only limited knowledge with respect to the facts to which the mistake relates but [treated its] limited knowledge as sufficient, or

"(c) the risk [should be] allocated to [LaConte] by the court on the ground that it is reasonable in the circumstances to do so." See Restatement of the Law, Second, Contracts (1981), Section 154.

With respect to the doctrine of "conscious ignorance," Comment *c* to Section 154 of the Restatement states:

"*c. Conscious Ignorance.* Even though the mistaken party did not agree to bear the risk, he may have been aware when he made the contract that his knowledge with respect to the facts to which the mistake relates was limited. If he was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of the mistake. It is sometimes said in such a situation that, in a sense, there was not mistake but 'conscious ignorance.' "

The illustration accompanying this comment is illuminating:

"2. * * * A proposes to B during the negotiations the inclusion of a provision under which the adversely affected party can cancel the contract in the event of a material error in the surveyor's report, but B refuses to agree to such a provision. The contract is not voidable by A, because A bears the risk of the mistake."

---

7. For purposes of this analysis, I will assume that the mistake concerns "a basic assumption on which the contract was made" and "has a material effect on the agreed exchange of performances." These assumptions mean that the contract will be voidable by the party adversely affected by the mistake, LaConte, unless LaConte bears the risk of the mistake under the rules set forth in Section 154 of the Restatement. Restatement of the Law, Second, Contracts (1981), Section 152(1).

A similar circumstance has happened here. By expressing their understanding, both parties recognized that there was a risk that admissions taxes would be charged but did not contractually allocate that risk. LaConte therefore bears it.

Even if LaConte did not bear the risk through conscious ignorance, I would find that it was reasonable to allocate the burden to LaConte rather than the county. Unlike property taxes, the liability for admissions taxes does not attach to the land; rather, the ordinances require the person who collects an admission fee to collect the amusement tax from the customer. Because the tax is assessed on the activity, and LaConte is the party conducting the activity, it is reasonable to allocate the burden to LaConte.

For these reasons, I would reverse the trial court's judgment and remand for the entry of a declaratory judgment in favor of the county. Accordingly, I dissent.